LORETTA M. HARHEN *vs.* STEPHEN L. BROWN & others.[1]

Suffolk. February 8, 2000. - June 27, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, & COWIN, JJ.

*Corporation,* Stockholder's derivative suit, Board of directors, Business judgment rule, Director's liability, Stockholder. *Words,* "Interested."

Discussion of the application of the business judgment rule to corporate officers and directors to whom a shareholder has directed a demand to institute suit on behalf of the corporation, and the distinction between interested and disinterested officers and directors in "demand excused" and "demand refused" cases. [842-845]

Where, before an action was brought by a corporate shareholder against the corporation and its directors for unlawful waste of corporate assets, the shareholder submitted a demand to the directors to institute such litigation on behalf of the corporation and a committee of directors refused the demand, and where the shareholder subsequently failed to allege sufficient facts that either the board of directors as a whole or its committee were "interested" in the asserted wrongdoings, the decision of the directors not to pursue litigation was entitled to the benefit of the protection of the business judgment rule: in the absence of any allegation of bad faith of the directors, the stockholder's claims were correctly dismissed. [845-848]

This court adopted an exception to the rule that, when a corporation's directors reject a shareholder's demand to institute litigation on behalf of the corporation, the shareholder must present the demand to all other shareholders: in circumstances in which the number of shareholders is so large that demand is an impossibly burdensome act, such demand may be excused. [848-849]

CIVIL ACTION commenced in the Superior Court Department on March 21, 1997.

The case was heard by *Allan van Gestel,* J., on motions to dismiss.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jeffrey B. Rudman (Daniel P. Tighe* with him) for Stephen L. Brown & others.

---

[1] E. James Morton; David F. D'Alessandro; Raeburn B. Hathaway, Jr.; F. William Sawyer; and John Hancock Mutual Life Insurance Company.

*Alan B. Morrison*, of the District of Columbia (*Jason B. Adkins* with him) for the plaintiff.

*Morris M. Goldings*, for Raeburn B. Hathaway, Jr., was present but did not argue.

*Thomas R. Kiley & Thomas B. Drohan*, for F. William Sawyer, submitted a brief.

*Loretta M. Smith*, for Associated Industries of Massachusetts, amicus curiae, submitted a brief.

IRELAND, J. The plaintiff, a policyholder of John Hancock Mutual Life Insurance Company (Hancock), made demand on Hancock's board of directors to commence litigation, alleging that the defendants, certain directors and employees of Hancock, had harmed Hancock by participating in or acquiescing in illegal lobbying of members of the Massachusetts Legislature. The board, a majority of whose members were disinterested, refused the plaintiff's demand through its committee.[2] The plaintiff then brought an action, claiming that the directors had wrongfully refused her demand and seeking to recover over $4 million from the defendants on Hancock's behalf. The defendants moved to dismiss the complaint, and a Superior Court judge allowed the defendants' motion without prejudice on the ground that the plaintiff had failed to plead with particularity that the committee appointed to respond to the plaintiff's presuit demand was interested; the judge therefore deferred to the business judgment of the committee. The Appeals Court reversed, *Harhen* v. *Brown*, 46 Mass. App. Ct. 793, 816 (1999), and we granted the defendants' application for further appellate review. Because disinterested directors are entitled to the protection of the business judgment rule in deciding whether to take action on a plaintiff's demand, and because the plaintiff has failed to allege facts of bad faith or that the board failed to investigate her demand, the Superior Court judge correctly allowed the defendants' motion to dismiss.

1. *Facts.* This case purports to be a derivative action brought pursuant to Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974). We summarize the facts as alleged in the plaintiff's complaint and in the documents attached and incorporated in the complaint. See *Nader* v. *Citron*, 372 Mass. 96, 97-98 (1977) (in ruling on motion to dismiss, court accepts as true allegations of

---

[2]For discussion of the composition of the board and its committee, and our analysis of its "disinterested" status, see *infra* at 842-848 & n.5.

complaint); *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (court may consider documents referenced in plaintiff's complaint without converting motion to dismiss into motion for summary judgment).

At all material times the plaintiff was a policyholder of Hancock. Chartered in Massachusetts in 1862, Hancock is one of the "top six" life insurance companies in the United States. Hancock has approximately seven million policyholders located in all fifty States, over 10,000 employees, 120 subsidiaries, and over $107 billion in managed assets and over $54 billion in direct assets. Hancock is headquartered in Massachusetts, and the Commonwealth is Hancock's primary regulator.

. Since 1991, Stephen Brown has been chairman of the board of directors and chief executive officer of Hancock. He previously had served as vice-chairman of the board, president, and chief operating officer. E. James Morton was Brown's predecessor; he served as chairman of the board and chief executive officer from 1987 to 1991, and thereafter remained a director and officer of Hancock. David F. D'Alessandro was senior executive vice-president of Hancock's retail sector until becoming president of Hancock on January 1, 1998. He also served as a director of Hancock at all material times. From 1982 through May, 1993, Raeburn B. Hathaway was a vice-president of Hancock and head of Hancock's government relations department. F. William Sawyer was Hancock's senior registered lobbyist and was responsible for Hancock's relations with the Massachusetts Legislature. He was neither an officer nor a director of Hancock.

The plaintiff's claims arise from Sawyer's lobbying activities on behalf of Hancock. In March of 1994, Hancock entered into settlement agreements regarding these lobbying activities with the United States Attorney's office and the State Ethics Commission, pursuant to which Hancock acknowledged it had violated the Commonwealth's illegal gratuity statute, G. L. c. 268A, § 3, and paid civil fines totaling $1,010,000.

As part of his lobbying efforts on Hancock's behalf, Sawyer cultivated friendships with Massachusetts government officials. He accomplished this through a variety of means, including the provision of entertainment, sports, food, and beverages. For example, in 1982, Sawyer took the then-chairman of the joint insurance committee and his wife to the Super Bowl football game, providing a gratuity of substantial value. See G. L. c.

268A, § 3 (a). Cf. *Commonwealth* v. *Famigletti*, 4 Mass. App. Ct. 584, 587 (1976). Sawyer also provided gratuities and entertainment to Massachusetts legislators during several conferences that were held in Puerto Rico, Florida, and Cape Cod. Between August 1, 1987, and May 30, 1993, Hancock's lobbyists provided entertainment, food, and golf on over 240 occasions.[3]

Brown, Morton, D'Alessandro, and Hathaway were members of Hancock's management committee. The committee was responsible for overseeing all aspects of Hancock's operations, including the government relations department. Members of the committee were kept informed of Sawyer's activities with government officials, and they "knew or should have known" of Sawyer's alleged illegal activities. The plaintiff alleged that the individual defendant directors, as members of the management committee, failed to take any action to assure Sawyer's compliance with the law, and that Hathaway "authorized" Hancock's funds "to be used in connection with Sawyer's illegal lobbying activities." Essentially, the plaintiff's complaint details Sawyer's lobbying activities and legal troubles, Hathaway's "encouragement" of Sawyer's conduct, and D'Alessandro, Morton, and Brown's alleged breach of the duty of care for failing to stop Sawyer's improprieties.

In the 1994 settlement agreements with the United States Attorney's office and the State Ethics Commission, Hancock agreed to reorganize its government relations department, retain outside counsel to review its lobbying activities, and institute auditing procedures by outside accountants. Further, Hancock instituted new procedures regarding lobbying activity, distributed these guidelines to employees, held training sessions concerning these new procedures, and placed a moratorium on entertainment of Massachusetts officials. Hancock stated that it had accepted Hathaway's early retirement and had reassigned Sawyer to a nonlobbying position.

On April 8, 1996, the plaintiff delivered a demand letter to

[3]Sawyer was tried and convicted of mail and wire fraud, interstate travel to commit bribery, and conspiracy in Federal District Court, but these convictions were vacated. See *United States* v. *Sawyer*, 85 F.3d 713, 719-720, 741 (1st Cir. 1996). Sawyer then pleaded guilty to one count of mail fraud. Sawyer's conviction was later vacated on a writ of coram nobis, in light of *United States* v. *Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999). See *United States* v. *Sawyer*, 74 F. Supp. 2d 88 (D. Mass 1999). For a related case, see *Scaccia* v. *State Ethics Comm'n*, ante 351, 353 (2000).

Hancock's board of directors that set out the above allegations regarding Hancock's lobbying activities. She alleged that, as a consequence of their actions and inactions, the defendants had cost Hancock four million dollars in fines, legal fees paid for the defendants, and damage to Hancock's reputation. She demanded that Hancock seek reimbursement of this monetary loss from the individual defendants. Her demand letter also raised several issues regarding the lack of policyholder democracy, specifically the insulation of the Hancock board from policyholders created by procedures that made it difficult for policyholders to nominate board members. The board referred the demand to a committee of two directors, I. MacAllister Booth and Lawrence K. Fish. On September 13, 1996, the committee wrote a short letter to the plaintiff, refusing her demand to institute suit. In the letter, the committee indicated that Hancock's corporate secretary was willing to meet with the plaintiff regarding issues of insulation of the board. On October 8, 1996, the plaintiff's attorneys met with two Hancock employees who were willing to consider the plaintiff's proposed amendment of Hancock's bylaws, but who would not discuss the refusal of her demand to institute suit. The plaintiff then commenced this action.

2. *Application of the business judgment rule to a presuit refusal of demand.* (a) *Corporate law background.* In general, the status of a majority of the board as either "interested" or "disinterested" is of significance to the manner in which a case is litigated. As described below, in a derivative action,[4] the board's status determines whether the plaintiff must make demand on the board or may seek to have demand excused as futile.

For purposes of shareholder derivative actions, we adopt the definition of an "interested" director that is stated in the Principles of Corporate Governance. See 1 ALI Principles of Corporate Governance: Analysis and Recommendations §§ 1.15 and 1.23 (1994); *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424

---

[4]For purposes of our analysis of the business judgment rule, we assume, without deciding, that a derivative action is available to policyholders of a mutual insurance company. The parties themselves have assumed the availability of a derivative action, as they have litigated the issues as if this were a corporate law case.

Mass. 501, 523-524 (1997).[5] The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiff's demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in wrongdoing. See *Rales* v. *Blasband*, 634 A.2d

---

[5]The Principles of Corporate Governance define the term "interested" as follows:

"(a) A director . . . or officer . . . is 'interested' in a transaction or conduct if either:

"(1) The director or officer, or an associate of the director or officer, is a party to the transaction or conduct;

"(2) The director or officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation;

"(3) The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

"(4) The director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation.

"(b) A shareholder is interested in a transaction or conduct if either the shareholder or, to the shareholder's knowledge, an associate of the shareholder is a party to the transaction or conduct, or the shareholder is also an interested director or officer with respect to the same transaction or conduct.

"(c) A director is interested in an action within the meaning of Part VII, Chapter 1 (The Derivative Action), but not elsewhere in these Principles, if:

"(1) The director is interested, within the meaning of Subsection (a), in the transaction or conduct that is the subject of the action, or (2) The director is a defendant in the action, except that the fact a director is named as a defendant does not make the director interested under this section if the complaint against the director:

"(A) is based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action, and

"(B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders."

1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 (1994).

927, 936 (Del. 1993). If the plaintiff has failed to allege facts that meet this standard with regard to a particular board member for purposes of ruling on a motion to dismiss, that member is deemed "disinterested."

In general, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that . . . all available means to obtain relief through the corporation itself" are exhausted by making demand on the corporations's board of directors to prosecute the litigation. *Bartlett* v. *New York, N.H. & H.R.R.*, 221 Mass. 530, 532 (1915). *Brewer* v. *Proprietors of the Boston Theatre*, 104 Mass. 378 (1870). The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or majority of shareholders should set the corporation's business policy, including the decision whether to pursue a lawsuit. See *Bartlett* v. *New York, N.H. & H.R.R., supra*; *Dunphy* v. *Traveller Newspaper Ass'n*, 146 Mass. 495, 497 (1888) ("It would be contrary to the fundamental principles of corporate organization to hold that a single shareholder can at any time launch the corporation into litigation . . . to prevent methods of management which [he or she] thinks unwise"). However, if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a "demand excused" case. See *Bartlett* v. *New York, N.H. & H.R.R., supra* at 534-535 (plaintiff not required to make demand on board of directors when demand would be "useless" or "an idle ceremony" because of board's interested status).

If the plaintiff chooses to make demand, the board may institute suit, take action short of litigation to resolve the issues the demanding shareholder has identified, or determine that no action is appropriate at that time. Should a board of directors, the majority of whom are disinterested, refuse the demand to pursue litigation, a plaintiff may pursue the lawsuit only by showing that the demand was wrongfully refused. This is referred to as a "demand refused" case.

In a demand refused case, because it is presumed that a disinterested board of directors acts "in good faith towards all [the corporation's] members," and because directors "as a matter of business policy[] may refuse to bring a suit," a disinterested board of directors that has refused a plaintiff's pre-suit demand is entitled to the protection of the business judgment rule. *S. Solomont & Sons Trust* v. *New England Theatres*

*Operating Corp.*, 326 Mass. 99, 113 (1950).[6] The business judgment rule affords protection to the business decisions of directors, including the decision to institute litigation, because directors are presumed to act in the best interests of the corporation. See *Kamen* v. *Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (citing several Delaware cases and stating that "[t]he purpose of requiring a precomplaint demand is to protect the directors' prerogative to take over the litigation or to oppose it. . . . In most jurisdictions, the board's decision to do the former ends the shareholder's control of the suit . . . while its decision to do the latter is subject only to the deferential 'business judgment rule' standard of review"). To show that a demand has been wrongfully refused, and that the directors are not entitled to the protection of the business judgment rule, a plaintiff must allege facts that challenge the board's good faith or the reasonableness of the board's investigation of the plaintiff's demand. See, e.g., *Scattered Corp.* v. *Chicago Stock Exch., Inc.*, 701 A.2d 70, 72-73 (Del. 1997).[7]

(b) *Analysis.* We review the Superior Court judge's dismissal of the complaint de novo. Cf. *Nader* v. *Citron*, 372 Mass. 96, 97-98 (1977). See *Brehm* v. *Eisner*, 746 A.2d 244, 253 n.13 (Del. 2000). This is a demand refused case. The plaintiff's complaint alleges only that Brown, Morton, and D'Alessandro, members of the board who are also named as defendants in this action, were interested. The board consisted of eighteen to twenty members, however, and there are no allegations that any other members of the board apart from those three were interested. Therefore, the plaintiff has failed to allege that a majority of the board was interested.

Despite the lack of allegations regarding a majority of the board, it is still necessary to consider whether the committee that voted to refuse the plaintiff's demand was interested. In her complaint, the plaintiff challenges the status of the committee, stating that Fish and Booth "lacked disinterest." The plaintiff's

---

[6]This approach is consistent with what appears to be the unanimous consensus of other States. See 2 D.J. Block, N.E. Barton, & S.A. Radin, The Business Judgment Rule 1611-1612 (5th ed. 1998) (collecting cases from other jurisdictions).

[7]Of course, where the failure to pursue a claim in itself is an illegal act or results in the continuation of an illegal act, the business judgment rule does not apply. See *Miller* v. *American Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974). There is no such allegation in this case.

complaint, however, fails to substantiate this assertion. As the allegations in the complaint make clear, Fish did not join the board until 1993, *after* the alleged wrongdoing had already occurred. As to Booth, the plaintiff first alleges that he was interested because he was serving on the board at the time of Sawyer's lobbying. However, mere membership on a board at the time of the alleged wrongdoing, without more, does not result in interested status. See note 5, *supra*. There is no allegation that Booth was a party to the transaction or events that underlie the plaintiff's complaint. See *id.* The plaintiff also alleges that Booth, who at the time was the chief executive officer of Polaroid, was interested because Hancock had purchased $18 million of Polaroid's long-term bonds. The purchase of the bonds, however, constituted only a small fraction of Hancock's $107 billion portfolio, and the plaintiff's complaint does not set out the extent of Polaroid's assets or total indebtedness. Nor does the plaintiff's complaint allege that Booth, or Polaroid, for that matter, had a material pecuniary interest in the transaction or indeed would benefit in any respect from a decision regarding the plaintiff's demand. See *id.* Cf. *Rales* v. *Blasband, supra* at 936-937 (two directors who were financially interested in outcome of litigation exerted influence over two board members, including a president of a bank that interested directors controlled). Therefore, under our definition of "interested," *supra* at note 5, the plaintiff has failed to allege sufficient facts that either the board as a whole or its committee were interested. Accordingly, we conclude, as did the Superior Court, that a majority of the board, and the members of its committee, were disinterested.

It is axiomatic that the decision of a disinterested board to refuse demand receives the protection of the business judgment rule. The plaintiff contends, however, that, because the board referred her demand to the committee, the heightened scrutiny of *Houle* v. *Low*, 407 Mass. 810 (1990), a demand excused case, should apply. There an interested board had referred the decision whether to terminate derivative litigation to a special litigation committee, consisting of the sole disinterested board member. See *id.* at 813. We did not give the board the benefit of the business judgment rule. Rather, we applied a heightened standard of review to the special litigation committee's decision to terminate the lawsuit, holding that, if an interested board appointed an independent and unbiased special litigation committee whose decision to terminate the litigation was "reasonable

and principled," the decision of the special litigation committee would stand. *Id.* at 820, 826. The heightened standard of *Houle* v. *Low*, *supra*, however, did not alter the application of the business judgment rule to cases in which the plaintiff makes demand on a board composed of a majority of disinterested directors and then claims that demand was wrongfully refused.

The difference between *Houle* and the present case turns on whether a majority of the board is "interested." In a demand refused case such as this, where the majority of the board is disinterested, the long-standing rule in Massachusetts is that the business judgment rule applies, absent a showing of bad faith or lack of investigation into the demand. See *Dunphy* v. *Traveller Newspaper Ass'n*, *supra* at 497 ("Intelligent and honest [people] differ upon questions of business policy. It is not always best to insist upon all one's rights . . ."). When a disinterested board refers a demand to a disinterested standing committee, both receive the protection of the business judgment rule. See *Spiegel* v. *Buntrock*, 571 A.2d 767, 777 (Del. 1990).

Contrary to settled case law, the Appeals Court concluded that the business judgment rule was inapplicable at the demand phase of a derivative lawsuit. *Harhen* v. *Brown*, 46 Mass. App. Ct. 793, 810 (1999). Apparently, the Appeals Court did not appreciate that the decision of Hancock's committee, appointed by and comprised of disinterested directors, to refuse demand was a business decision not to pursue litigation that should receive the protection of the business judgment rule.[8] The Appeals Court therefore misinterpreted *Houle* v. *Low*. To clarify, the business judgment rule is applicable in the context of a refusal of a presuit demand made either by a board composed of a majority of disinterested directors or its committee, whose members, in turn, are also disinterested. Such an approach is wholly consistent with our precedent of the last one hundred years.

Thus, the only remaining issue is whether the plaintiff has alleged sufficient facts that either the board or its committee acted in bad faith, or failed to investigate the claims adequately. The plaintiff argues that the cursory nature of the corporation's refusal demonstrates a lack of investigation. Contrary to the

---

[8]According to the Appeals Court's interpretation, the decision of a committee appointed by a board, the majority of whose members are disinterested, is to be subjected to the same standard of judicial review as the decision of a committee appointed by an interested board. We do not agree.

conclusion reached by the Appeals Court, see *Harhen* v. *Brown*, *supra* at 805-807, however, lengthy explanations of a demand refusal are not required. See 2 ALI Principles of Corporate Governance: Analysis and Recommendations § 7.04 comment d (1994). The refusal letter, while brief, was adequate. It referenced to the plaintiff's demands and stated that those demands had been "carefully reviewed." Further, at the time the demand was made, Hancock had already performed an internal investigation, reassigned or retired Sawyer and Hathaway, and instituted a moratorium on entertaining government officials. The brief nature of the reply does not impugn the reasonableness of the board's investigation. See *Levine* v. *Smith*, 591 A.2d 194, 214 (Del. 1991), overruled on other grounds by *Brehm* v. *Eisner*, 746 A.2d 244 (Del. 2000) (directors presumed to act in an informed manner in refusing demand). The fact that the two employees who met with the plaintiff's attorneys were unwilling to answer questions about why the demand was refused is not sufficient as a matter of law to establish bad faith. See *id*; Boeing Co. *vs.* Shrontz, No. 11273 (Del. Ch. 1994).

Because the business judgment rule applies to the decision of the disinterested board, and because the plaintiff has failed to allege facts of bad faith or that the board failed to investigate her demand, the plaintiff's action was properly dismissed.

3. *Demand on other policyholders excused.* After the board's committee refused the plaintiff's demand, she did not make a demand on Hancock's seven million policyholders. Sawyer argues that the plaintiff's failure to make demand on Hancock's other policyholders bars her suit.

In general, if the board of directors rejects a shareholder's demand, the shareholder must then present the demand to all other shareholders. See *S. Solomont & Sons Trust* v. *New England Theatres Operating Corp.*, 326 Mass. 99, 113 (1950); *Bartlett* v. *New York, N.H. & H.R.R.*, 221 Mass. 530 (1915). Although California, Delaware, and New York have eliminated this requirement, a "substantial minority" of jurisdictions, including Massachusetts, continue to require that demand be made on other shareholders. See 2 D.J. Block, N.E. Barton, & S.A. Radin, The Business Judgment Rule: Fiduciary Duties of Corporate Directors 1686-1688 (5th ed. 1998). The rationale for demand on other shareholders is that such a requirement allows the majority of shareholders to determine whether legal action is in the corporation's best interest.

We do, however, recognize an exception to the requirement that demand be made on other shareholders when such demand would be futile because the shareholders are interested. See *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 218 (1978) (excusing demand on shareholders "in the situation where a majority of the . . . shareholders were alleged wrongdoers or under the control of such wrongdoers"). The plaintiff argues that we should recognize another exception to the rule; that is, when the number of other shareholders is so large that demand becomes a "pointless or . . . impossibly burdensome act." *Levitt* v. *Johnson*, 334 F.2d 815, 818 (1st Cir. 1964), cert. denied, 379 U.S. 961 (1965) (excusing demand on 48,000 other stockholders). Although we have not previously recognized such an exception, see *Pomerantz* v. *Clark*, 101 F. Supp. 341, 345-346 (D. Mass. 1951) (attempting to determine whether Massachusetts courts would recognize such an exception, Federal District Court held that we would not), we conclude today that an exception to the shareholder demand requirement, where a very large number of shareholders is involved, as in this case, is eminently reasonable, and we therefore adopt such an exception. To hold otherwise would place a tremendous financial and administrative burden on plaintiffs, in this case requiring the plaintiff to make demand on the seven million other policyholders.

4. *The defendants' other arguments.* The defendants have also raised issues regarding the availability of a derivative action to policyholders in a mutual insurance company, the statute of limitations for the plaintiff's claims, the effect of a bylaw that mandates indemnification of officers' and directors' legal fees, and the legal effect of the vacation of Sawyer's convictions. Because of our resolution of this case on the basis of the business judgment rule, we need not address these issues.

*Judgment affirmed.*

Justice Lynch participated in the deliberation on this case, but retired before the opinion was issued.