van Gestel, J.
This matter is before the Court on two motions: (1) the motion of the director defendants to dismiss the plaintiffs amended verified complaint against them; and (2) the motion of the defendant Arthur T. Demoulas (“Arthur T.’j to dismiss the amended verified complaint against him.[2] The plaintiff, Arthur S. Demoulas (“Arthur S.’j, purports to proceed both individually and derivatively on behalf of the defendant Demoulas Super Markets, Inc. (“DSM”).
BACKGROUND
This lawsuit presents yet another round in the seemingly never ending internecine battles among members of the Demoulas family in the Massachusetts courts.[3] The following facts are taken principally from Arthur S.’s amended verified complaint.
The triggering event for this lawsuit is a September 9, 2002 memorandum request from Arthur T. addressed to the DSM directors, asking them to facilitate his “desire to have the freedom to pursue [his] own interests within the same type of business as DSM or any other type of business. To have such freedom of action, [he] would need to end any fiduciary duty [he has] to DSM in any capacity.” Arthur T. advised the DSM board, “In order to accomplish this, I propose to resign my position with the company if [the board will] permit me to transfer my shares of the company’s Class B common stock to my wife Maureen, who will then transfer them to an irrevocable voting trust.” By so doing, Arthur T. said, his wife “will receive the economic benefits associated with the shares, but the trustee will have sole voting power.”
Arthur S., by his complaint, seeks a declaration pursuant to Mass. G.L.c. 231A, Sec. 1, that “Arthur T. has fiduciary obligations to DSM and to Arthur S., that he may not extinguish by nominally transferring the economic benefits associated with his DSM stock to his wife, and voting rights relating to that stock to a ‘trustee’ selected by Arthur T. and who will be paid, and subject to removal at regular intervals, by his wife.”
Arthur S. also seeks related declaratory and injunc-tive relief, as well as “all damages caused by [the defendant directors’] waiver of the existing restrictions upon the transfer of Arthur T.’s shares, and their failure and refusal to impose meaningful restrictions on Arthur T.’s rights to compete with, solicit the employees of, usurp the corporate opportunities of or misappropriate the confidential information of, DSM, in breach of their fiduciary duties to DSM.”
The amended verified complaint is, to say the least, prolix in the extreme, covering as it does the better part of 30 pages, in 66 main paragraphs, several with multiple sub-parts. Full familiarity with all aspects of the amended complaint by the parties is presumed. Consequently, the Court will not here take the time and space to recite everything included therein, preferring to state only those allegations pertinent to this memorandum and order.
DSM is clearly a close corporation under Massachusetts law. It “was initially formed as a Delaware corporation in 1964; in 1982, a new Massachusetts corporation was formed and the Delaware corporation was merged into it.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 511 (1997) (hereafter “Demoulas”).
All of DSM’s stock is owned, in various ways, by different members of the Demoulas family. The heirs of George Demoulas constitute the “Class A” shareholder group. Arthur S., a son of George Demoulas, is a Class A shareholder. The wife and children of the late Telemachus A. Demoulas are members of the “Class B” shareholder group. Arthur T., a son of Telemachus Demoulas, is a Class B shareholder.
*702 The complaint recites that Rafaele Demoulas is the administratrix of the estate of Evan Demoulas, another son of George Demoulas and a Class A shareholder. It is alleged that in “exchange for benefits granted to her by the Class B shareholders, including the right to select one of the directors of DSM, Rafaele Demoulas votes the estate’s shares with the Class B shareholder group.”
Arthur S. alleges that the Class B shareholders are said to own a majority of the votable stock of DSM.[4]
As presently constituted, and for all times material hereto, the DSM board of directors has had seven members. Under the DSM Articles of Organization, as amended, two of the seven directors (called the “Class A directors”) are chosen by the owners of the Class A stock; two of the directors (called the “Class B directors”) are chosen by the owners of the Class B stock; and the remaining three directors (called the “A-B directors”) are chosen by a majority of the votable stock of DSM.
Currently, the Class A directors are Gerard J. Lev-ins (“Levins") and Arthur S. The Class B directors are Sumner Darman (“Darman”) and Edward H. Penderg-ast (“Pendergast”). Pendergast was selected by Rafaele Demoulas, but was elected exclusively by the Class B shareholders. The A-B directors are J. Terrence Carle-ton (“Carleton”), Charles Roazen (“Roazen”) and William J. Shea (“Shea”). Shea serves as chairman.
Arthur S. alleges that the five defendant directors— Darman, Pendergast, Carleton, Roazen and Shea— "have consistently advanced the interests of Arthur T.’s branch of the Demoulas family at the expense of DSM and its other shareholders." The complaint contains examples that are proffered to support this conclusion.
Paragraph 14 of the complaint sets the tone that is ever in the background among the Demoulas family members. It reads in its entirety:
Relations between the Class A and Class B shareholders are acrimonious. Prior decisions of this Court and the Supreme Judicial Court establish that, for a period of more than a quarter century, Arthur T., and other Class B shareholders, and Telemachus Demoulas, acted in derogation of their fiduciary duties to DSM and to the present Class A shareholders. In each instance, Arthur T., other Class B shareholders, and Telemachus Demoulas, advanced their own economic interests at the expense of DSM and the present Class A shareholders. Arthur T.’s contemplated stock “transfer” scheme is simply the latest in a long line of such abusive tactics by Class B shareholders.
DSM’s Articles of Organization prevent the transfer of any shares in the company to anyone unless those shares are first offered for sale to DSM. If offered, the market value of the shares is to be determined by an expert appraisal. Upon completion of the appraisal, the DSM board may then choose to purchase, or not to purchase, those shares. If the board elects not to purchase the shares, then they may be sold to any third party or entity. The Articles further provide that the directors may waive DSM’s right to insist upon the foregoing procedure. Arthur T.’s memorandum to the directors of September 9, 2002 sought such a waiver.
The directors held a number of meetings at which they considered Arthur T.’s request. At the first meeting on September 18, 2002, the proposal was defeated by a vote of four to two, with one director abstaining. At the second meeting on November 13, 2002, after a presentation by Arthur T., the directors voted five to two to approve the waiver. The five voting in favor included the two Class B directors and the three A-B directors. This latter vote was conditioned upon Arthur T.’s willingness to enter into an agreement that, according to Arthur S., would leave Arthur T. “free to compete [with DMS] in the Real Estate Business and would impose restrictions of little practical significance on his ability to compete with DSM in the Supermarket Business, to solicit DSM employees, or to utilize DSM’s corporate opportunities.”
The five defendant directors engaged Attorney James E. Wallace of Bowditch & Dewey, LLP, to negotiate an agreementwith Arthur T.’s counsel. The agreement produced appears as part of Exhibit D to the complaint.
In addition to his work on the agreement, Mr. Wallace provided to the directors a letter dated June 13, 2003, containing his opinions on certain issues. The letter is attached to the complaint as Exhibit E. In the letter he opined that, in the absence of a non-competition agreement, an at-will employee like Arthur T. may leave his employment and, subject to certain restrictions, engage in competition with his former employer, but he could not misappropriate trade secrets or use confidential information for his own interests. Mr. Wallace also observed, however, that Arthur T. is a minority shareholder as well as an employee and therefore has fiduciary duties — explained in the letter — running to DSM arising from that status. Mr. Wallace’s letter concludes with the following two paragraphs addressing the proposed agreement with Arthur T:
Absent controlling case law, it cannot be said with certainty that Arthur T.’s transfer of the DSM shares to Maureen and Maureen’s subsequent transfer of the shares to the voting trust release Arthur T. of his fiduciary duties to DSM and the other shareholders. Therefore, with respect to the issue of corporate opportunities, we cannot advise DSM and its Board of Directors that entering into the proposed agreement with Arthur T. provides DSM with greater protections than DSM is entitled to under common law. On the other hand, the noncompetition and non-solicitation provisions of the proposed agreement clearly afford DSM greater *703 protection than it would have vis-a-vis Arthur T. as a former employee.
Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company.
After the discussions at the August 4, 2003 director’s meeting, by a vote of five to two the proposed transfer of Arthur T.’s shares and the agreement were approved. It was the five defendant directors who voted in favor.
This lawsuit followed almost immediately.
Paragraphs 35 and 36 of the amended complaint are relevant to aspects of the motions under consideration. They read in their entirety as follows:
35. This is a demand excused case as it relates to the derivative claims. The five defendant Directors constitute a majority of the DSM Board of Directors. They were selected, nominated, elected, and are retained in office, by Arthur T. and his branch of the Demoulas family. They have historically, and in connection with the transaction that is the subject of this case, shown bias in favor of the B shareholders to the detriment' of both DSM and the A shareholders. They have acted in concert with Arthur T, and have breached their fiduciaiy duties to DSM. They are participants in the wrongful conduct alleged in this Complaint. This action seeks recovery from the defendant directors for the harm done to, and costs incurred by, DSM as a result of the defendant directors’ conduct. In these circumstances, demand made on the DSM Board of Directors would be futile. The defendant directors cannot reasonably be expected to bring suit to obtain judgments against themselves, or to enjoin Arthur T. from engaging in conduct that they approved.
36. Demand on DSM’s shareholders would be futile because the Class B stockholders (Arthur T. and other members of his branch of the Demoulas family) own a majority of the votable stock of DSM, because there is a long history of animosity and litigation between Arthur S. and the Class B stockholders, because Rafaele Demoulas, a Class A stockholder, participates in a voting alliance with the Class B stockholders, because Arthur S. and Rafaele Demoulas are engaged in separate litigation, and because defendant Pendergast, the director who represents Rafaele Demoulas on the DSM Board of Directors, voted in favor of the transactions described above.
In what is called a ‘Transmittal Affidavit,” counsel for Arthur T. attested to the accuracy of and submitted to the Court a number of documents. Included were the Curricula Vitae for each of the defendants Carleton, Roazen, Shea and Pendergast and the transcripts, or partial transcripts, of DSM directors’ meetings for September 18, 2002, November 13, 2002, December 16, 2002, March 21, 2003, and April 30, 2003, and transcripts of the stockholders’ meetings for June 18, 2002, and June 17, 2003.[5]
The directors Carleton, Roazen, Shea and Penderg-ast are not employees of DSM or any member of any branch of the Demoulas family, and are not dependent upon their positions as directors as a result of anything provided to them by DSM or any member of any branch of the Demoulas family. To that extent, at least, they are each independent and disinterested.
It is generally in this posture that the Court is asked to address the motions.
DISCUSSION
In part these motions may be basic motions to dismiss controlled by Mass.R.Civ.P. Rule 12(b)(6); and in other ways they clearly are governed by Mass.R.Civ.P. Rule 23.1. The resolution of this issue depends upon whether any of the claims presented are other than derivative claims under Rule 23.1.
There are six counts in the amended complaint, bearing the following titles: Count One — By Arthur S. Individually Against Arthur T. Demoulas, For A De-claratoiy Judgment As To The Fiduciaiy Obligations [of] Defendant Arthur T. Demoulas; Count Two — By Arthur S. Individually, For Breach of Fiduciary Duly Against Defendant Arthur T. Demoulas; Count Three —Derivative Claim Against Arthur T. Demoulas For A Declaratory Judgment As To The Fiduciaiy Obligations Of Defendant Arthur T. Demoulas; Count Four— Derivative Claim For Breach of Fiduciaiy Duly Against Defendant Arthur T. Demoulas; Count Five — Derivative Claim For Misappropriation of DSM’s Trade Secrets and Confidential Information Against Arthur T. Demoulas; and Count Six — Derivative Claim For Breach of Fiduciaiy Duty Against Defendant Arthur T. Demoulas and Defendants Darman, Pendergast, Carleton, Roazen and Shea.
Counts Three, Four, Five and Six are each said by Arthur S. to be derivative claims. Consequently, regarding them, the Court will assess the motions through the glass of Rule 23.1.
Counts One and Two are said to be individual claims by Arthur S. against Arthur T, relating to his fiduciaiy duties. They first must be examined, however, to determine whether they actually may be derivative claims instead.
Arthur T. argues that Counts One and Two do not articulate any discrete claims or theories that are uniquely “individual” to Arthur S., and all of the claims are, in substance, derivative. In Bessette v. Bessette, 385 Mass. 806, 809 (1982), the Supreme Judicial Court spoke to the issue as follows:
The plaintiffs argue that in this case a fiduciaiy duty is owed directly to them as minority stockholders. They contend that if a majority stockholder received distributions from a close corporation in the form of an excessive salaiy and payments on *704 notes for which the corporation received no consideration, individual stockholders may recover on their own behalf. See Donahue v. Rodd Electrotype Co., supra at 578. However, our holding in Donahue applies if “(i]t would be difficult for the plaintiff. . . to establish breach of a fiduciary duty owed to the corporation. ” Supra at 589 n.14.
The SJC went on to hold that the “judge correctly ruled that the plaintiffs could assert their claims only as a stockholders derivative action.” Id. at 810.
A review of Counts One and Two show them to be essentially identical to Counts Three and Four, seeking as they do declaratory and injunctive relief as to the effect and consequences of Arthur T.’s proposal with regard to his fiduciary duties. This is just the same situation as in Bessette, and should be treated accordingly. See also Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. 751, 764-65 (1991). This Court, therefore, will treat the entire amended complaint as presenting derivative claims subject to Rule 23.1.
In significant part, Rule 23.1 mandates that:
The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority, and the reasons for his failure to obtain the action or for not making the effort.
It is here that the situation gets murky. Arthur S. alleges in paragraph 35, quoted above, “This is a demand excused case as it relates to the derivative claims.” At oral argument on the motions, however, counsel for all defendants — including Arthur T. — reported to the Court their agreement that a demand was in fact made, and it was refused.
Even though the defendants concede — indeed, insist — that a demand was made, Arthur S. prefers to argue that the making of any demand was excused and, therefore, not necessary.
The defendants do not agree that any demand was excused, and they insist, in any event, that a demand was made. They then state that this is, therefore, a demand refused case, apparently preferring to argue from the point of view of a proper refusal of the demand having been made.
The Court is then led to Harhen v. Brown, 431 Mass. 838 (2000), the SJC’s recent exposition of the demand requirement under Rule 23.1. Justice Ireland explained the reasoning behind the demand requirement and the difference between a demand excused case and a demand refused case as follows:
In general, before filing a derivative action on behalf of a corporation, a plaintiff “must establish that.. . all available means to obtain relief through the corporation itself’ are exhausted by making a demand on the corporation’s board of directors to prosecute the litigation The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation’s business policy, including decisions whether to pursue a lawsuit . . . However, if a majoriiy of directors are alleged to have participated in the wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a “demand excused” case.
If the plaintiff chooses to make demand, the board may institute suit, take action short of litigation to resolve the issues the demanding shareholder has identified, or determine that no action is appropriate at that time. Should a board of directors, the majority of whom are disinterested, refuse the demand to pursue litigation, a plaintiff may pursue the suit only by showing that the demand was wrongly refused. This is referred to as a “demand refused” case.
Id. at 844.
The reason that the defendants so readily proffer that a demand was made and refused is also explained by Justice Ireland.
In a demand refused case, because it is presumed that a disinterested board of directors acts “in good faith towards all [the corporation’s] members,” and because directors “as a matter of business policy (] may refuse to bring a suit,” a disinterested board of directors that has refused a plaintiffs pre-suit demand is entitled to the protection of the business judgment rule . . . The business judgment rule affords protection to the business decisions of directors, including the decision to institute litigation, because directors are presumed to act in the best interests of the corporation ... To show that a demand has been wrongfully refused, and that the directors are not entitled to the protection of the business judgment rule, a plain tiff must allege facts that challenge the board’s good faith or the reasonableness of the board’s investigation of the plaintiffs demand.
Id. at 844-45.
There are no factual allegations in the amended complaint revealing a demand by Arthur S. or a refusal of that demand. Thus, in the matter and on the record currently before the Court, whether this is, as alleged, a demand excused case will depend upon whether a majoriiy of the directors “are alleged to have participated in the wrongdoing, or are otherwise interested." Rule 23.1 places the burden on Arthur S. to allege with particularity the factors relating to the demand issues.
The “wrongdoing” here must be seen as Arthur T.’s attempt to avoid his fiduciary duties to DSM and his fellow shareholders by the scheme he proposed to the directors. It is not the transfer of his stock, however, that constitutes a violation of any fiduciary duly. It is what Arthur T. does thereafter by way of competing *705 with DSM, soliciting its employees, seizing its corporate opportunities, utilizing its trade secrets or confidential information and the like that may — or may not — constitute a breach, depending upon the circumstances and regardless of who holds his stock or how it is held. To this extent there is a significant degree of prematurity about this case.[6]
In any event, since the transfer of Arthur T.’s stock is not improper in and of itself, considering and voting on a waiver to permit such a transfer by the board of directors — particularly when such a waiver is authorized by the DSM Articles of Organization — cannot be seen as the wrongdoing either. Consequently, the directors, on the allegations of the present amended complaint, cannot be said to have “participated in the wrongdoing.”
A demand may also be excused as futile, however, if the directors are “otherwise interested.” Id. at 844. In Demoulas, 424 Mass. at 523, the SJC affirmed a finding by the trial judge that the then directors of DSM were “interested” in that they “had a business or financial relationship with Telemachus’s family, were subject to his controlling influence, or stood to benefit personally from the transactions at issue.”
A majority of the current directors are not shown by the amended complaint to have any business or financial relationship with Arthur T. or his side of the Demoulas family, nor have they been shown to stand to benefit personally from the transaction at issue. Thus, unless they are shown to be subject to Arthur T.’s controlling influence, under the standards for determining interestedness set out in Demoulas at 523-24, and Harhen at 842-43, and n.5, they must be considered and treated for purposes of these motions as disinterested.
Of the ALI Principles of Corporate Governance relied upon in both Demoulas and Harhen, only one of the criteria remains to be reviewed. It is Subsection (a)(4), which reads:
The director... is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director’s . . . judgment with respect to the transaction or conduct in a manner adverse to the corporation.
The Court now re-examines the amended complaint to determine whether Arthur S. has, as he must under Rule 23.1, alleged “with particularity . . . the reasons for his failure to obtain the action or for not making the effort.”
The Court sets the background by taking notice, Dwight v. Dwight, 371 Mass. 424, 426 (1976), of that portion of the Judgment Following Rescript entered in the underlying case in Demoulas, Middlesex Superior Court #90-2344-B, dated February 4, 1999. Section 20 thereof reads as follows:
The shareholders [of DSM] elect a new board of directors that shall henceforth consist of:
a. Two members of the George Demoulas family or their nominees, including Arthur S. Demoulas;
b. Two members of the Telemachus Demoulas family or their nominees excluding Telemachus Demoulas, D. Harold Sullivan and James T. Curtis; and
c. Three disinterested, independent directors who meet the standards of independence as published by the New York Stock Exchange (“NYSE”).
The A-B directors — Carleton, Roazen and Shea— are, by the foregoing judgment, supposed to be “disinterested, independent directors.” Nothing in the amended complaint alleges that any proceeding has been brought by any shareholder, including particularly Arthur S., challenging the status of these directors.
Further, the ALI Principles of Corporate Governance, in Sec. 1.23(c) (2), provides that a director is not deemed “interested” with respect to a complaint naming him as a defendant if the complaint is “based only on the fact that the director approved or acquiesced in the transaction or conduct that is the subject of the action, and . . . does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders.”
The Court now returns to the amended complaint to ascertain what it alleges — with particularity — about the interestedness of the various directors or whether they acted in bad faith. Harhen, supra, 431 Mass. at 847. The allegations are summarized as follows:
The Class B shareholders, in alliance with the Class A shareholder Rafaele Demoulas, have selected the A-B directors. (Paras. 15 & 16.)
The A-B directors were “selected by, or requested to act as directors by Telemachus Demoulas, Arthur T. or a person acting on their behalf.” ‘Their continuing status and substantial compensation as directors of DSM is wholly dependent on the continuing support of Arthur T. and his branch of the Demoulas family.” (Para. 16.)
The five defendant directors “have consistently advanced the interests of Arthur T.’s branch of the Demoulas family at the expense of DSM and its other shareholders.” (Para. 17.)
Examples of these actions are: allowing DSM to pay Telemachus Demoulas a $1,000,000 per year consulting fee and to make “substantial annual contributions” to his DSM Profit Sharing Plan, and providing him a company car; allowing Arthur T. to remain as a high-paid executive of DSM; allowing Telemachus Demoulas and Arthur T. to serve as trustees of the DSM Profit Sharing Plan; allowing Darman to serve as counsel to DSM while also *706 serving as personal counsel to Arthur T., to serve as intermediary between DSM’s independent counsel and Arthur T. over the matter in issue, and giving improper advice regarding the consequences of Arthur T.’s proposal; allowing the same accounting firm that serves Arthur T. and his side of the family to also serve as accountants for DSM; and ignoring alleged evidence that Arthur T. had invested in a spring water company that was a corporate opportunity for DSM. (Para. 17, sub-paras, a. through f.)
The defendant directors voted in favor of Arthur T.’s proposal to waive the limitations on his transfer of stock despite Arthur T.’s stated intention to compete with and harm DSM. (Para. 20, 23, 24 & 33.)
The defendant directors voted to approve an agreement with Arthur T. that was grossly favorable to Arthur T. in his ability to compete with DSM, acquire its corporate opportunities and solicit away its employees. (Para. 27.)
The defendant directors failed to seek appropriate independent legal advice before voting on Arthur T.’s proposal and contract. (Para. 29.)
The defendant directors attempted to justify their actions on Arthur T.’s proposal by proffering “entirely pretextual” comments. (Para. 32.)
Were this Court scrutinizing a tabula rasa, it would have considerable difficulty in finding sufficient particularity in the allegations of the amended complaint to get over the pleading bar presented by Rule 23.1. As it said itself in deciding the motion to dismiss in Harhen, “a Court is ill equipped to burst into the boardroom and make decisions as to what actions should be taken in the best interests of the company.” Harhen v. Brown, Suffolk Superior Court, Civil Action No. 97-1522-H (7 Mass. L. Rptr. 598), Memorandum and Order on Defendants’ Motion to Dismiss at p. 3. “Massachusetts has always recognized the need for courts to abstain from interfering in business judgments.” Houle v. Low, 407 Mass. 810, 824 (1990). “Intelligent and honest men differ upon questions of business policy. It is not always best to insist upon one’s rights . . .” S. Solomont & Sons Trust v. New England Theatres Operating Corp., 326 Mass. 99, 112 (1950).
But the slate here is far from clean. Demoulas, supra, 424 Mass. 501, is hardly a lonely orphan in the annals of Massachusetts’s court decisions involving the Demoulas family and their management — and mismanagement — of DSM for their own personal benefit, despite the wide array of fiduciary duties that surround them. This Court, therefore, cannot ignore the recorded history that hovers as an immense cloud over the Demoulas family and its members’ involvement with DSM as a company.
At this stage of the case, before any answers have even been filed and in the total absence of any discovery, this Court concludes that the amended complaint pleads its claim for a demand excused case with sufficient particularity to avoid dismissal on the two pending motions therefor. The question of whether the directors were interested because of some control over them exercised by Arthur T. or otherwise acted in bad faith cannot be resolved solely by reading the amended complaint. Consequently, the potential for shelter over their actions from the business judgment rule as expressed in G.L.c. 156B, Sec. 65 must remain for another day.
This memorandum should not, however, be read by Arthur S. as an indication that his present claims will ultimately survive, whether or not the directors’ actions are ultimately tested by the business judgment rule or by some enhanced scrutiny. Nor, in the same vein, should Arthur T. proceed with total confidence that his proposal regarding the transfer of his stock will achieve his goal of freeing himself from those fiduciary duties that prevent him from competing with DSM, usurping its corporate opportunities or otherwise harmfully interfering with its business. In short, whether the directors acted appropriately or not will not provide the answer to whether later actions of the nature hinted at by Arthur T. are without serious risks.
It must be clear to all members of the Demoulas family that accommodation, not acrimonious litigation, is in their ultimate best interest and in the interest of DSM and the very many employees who depend upon it. But only the family members can bring about such accommodation.
ORDER
For the foregoing reasons, the motion of the director defendants to dismiss the plaintiffs amended verified complaint against them and the motion of the defendant Arthur T. Demoulas to dismiss the amended verified complaint against him are each DENIED.

Although Arthur T.’s motion is phrased as being filed as alternatively seeking summary judgment, the Court treats it solely as a motion to dismiss.

See, e.g., Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501 (1997).

The defendant directors, however, in their memorandum supporting their motion to dismiss at p. 18, take a contrary position. They claim that the Court in Demoulas “awarded control of2500 shares to A.S. Demoulas’ branch of the family, and left 2450 shares with the Telemachus branch.” This Court, on motions to dismiss, cannot resolve this seemingly indisputable issue.

Arthur S. objects to the Court’s use of these documents. However, given the free commentary by Arthur S. in his amended complaint about what occurred at directors’ and shareholders’ meetings, and the issues he raises in his complaint about the independence or disinterestedness of various directors, consideration of these documents, for the purposes of assessing the present motions, does not seem inappropri *707 ate. See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Berkowitz v. President & Fellows of Harvard College, 58 Mass.App.Ct. 262, 270 n.7 (2003).

With regard to the declaratoiy judgment counts particularly, “ The duty of this [C]ourt ... is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions . . .’ Caputo v. Board of Appeals of Somerville, 330 Mass. 107, 111 (1953), quoting from Mills v. Green, 159 U.S. 651, 653 (1895).” Jefferson Const. Corp. v. Commonwealth, 386 Mass. 142, 143 (1982). See also Brown v. Neelon, 335 Mass. 357, 360 (1957).