Sanders, Janet L., J.
Plaintiff Arlene J. Averbuch (Averbuch), a Trustee of the Jack A. Averbuch Trust, has brought this shareholder derivative action for the benefit of nominal defendant Investco Trust for Investment Grade Municipals (VGM). Averbuch alleges that VGM’s board of trustees and its former investment advisor, Van Kampen Asset Management (VKAM), breached their fiduciary duties in connection with decisions they made to redeem certain of VGM’s preferred shares. VGM now moves to dismiss the case pursuant to G.L.c. 156D, §7.44. For the reasons that follow, the Court concludes that VGM’s Motion must be allowed.
BACKGROUND
VGM is a closed-end investment company which at the time of this lawsuit, operated within a fund complex called the Van Kampen Funds. Each of the funds is governed by a board of trustees comprised of the same eleven trustees (Trustees), ten of whom are independent. Until June 1, 2010, the funds’ investment advisor was VKAM, a subsidiary of Morgan Stanley. On June 1, 2010, Investco acquired VKAM from Morgan Stanley, and the funds’ advisor became Investco Advisors, Inc.
VGM’s business model is to raise capital by the issuance of shares, then invest that capital in various income yielding securities, with the income earned on those investments returned to the common shareholders after the fund’s expenses are paid. Unlike an open-end fund, a closed-end fund has a set number of common shares that does not change based on the inflow and outflow of investor capital. In order to provide leverage for the portfolios of its common shareholders, VGM—like many closed-end funds—for many years issued Auction Rate Preferred Shares or “ARPS.” ARPS are preferred shares with a value determined through periodic Dutch auctions that are conducted by independent broker dealers.[1] These auctions set the ARPS dividend rate by matching the rate at which buyers and sellers of ARPS are willing to transact.
*388 In February 2008, with the financial crisis on the horizon, ARPS auctions began to fail nationwide: the auctions did not attract enough willing buyers to meet the influx of holders trying to sell their positions. As a result, the ARPS auctions of many closed-end funds, including those of the Van Kampen Funds, froze (and remain frozen to this day). The auction failures not only left the ARPS holders with illiquid securities, but also triggered the funds’ contractual obligation to pay those holders interest at a penalty—or “Maximum Rate.” Finally, the funds had to be closely monitored to make sure they complied with section 18(a)(2) of the Investment Company Act of 1940, which required that the preferred shareholders have an asset coverage ratio of at least 200 percent before any dividends on common stock could be declared.
Soon after the collapse of the auction markets, ARPS holders, financial advisors, and broker-dealers contacted VRAM as well as the Trustees. They expressed their concern over the auction failures and their desire that VRAM actively work to restore liquidity to the ARPS holders. Some broker-dealers told VRAM representatives that their firms would no longer provide access to their clients or customers unless the liquidity problem was resolved. Wachovia and A.G. Edwards, in particular, implicitly threatened to end their business relationship with VRAM if the firm did not provide some relief.
The failure of the ARPS auctions also proved problematic for VRAM’s parent company, Morgan Stanley. Following the failures, several state regulatoiy authorities and the SEC announced investigations of Morgan Stanley and other large broker-dealers. The investigations prompted Morgan Stanley to enter into a settlement agreement in August 2008. Pursuant to that settlement, Morgan Stanley agreed to repurchase ARPS at face value (or at par) from certain retail customers.
Approximately two months after the auction markets collapsed, VRAM proposed that the Van Rampen Funds redeem a portion of their outstanding ARPS by using proceeds from the issuance of Tender Options Bonds (TOBs). The Trustees approved the redemp-tions following a May 8, 2008 board meeting, and the redemptions began on June 30, 2008. Three additional rounds of redemptions occurred in 2009 and 2010 with the Trustees’ approval. In each round, the AJRPS were redeemed at par. Some of the redemptions were financed with cash on hand rather than with TOB proceeds.
In 2010, the Trustees received demand letters from common shareholders of several Van Rampen Funds, including VGM shareholders Rudy and Maxine Nelson, alleging that VRAM and the Trustees breached their fiduciary duties. Specifically, the Nelsons and other shareholders contended that they had been harmed by the decision to redeem the ARPS at face value rather than at their discounted secondary market value; they also complained about the choice of TOBs to replace the leverage created by the ARPS, given that TOBs had less favorable terms. The shareholders maintained that VRAM had made its recommendations concerning redemptions, not for the benefit of the funds, but to preserve the business relationships that it and its Morgan Stanley affiliates had with ARPS holders and their financial advisors and broker-dealers. The shareholders alleged that the Trustees then failed to take into account VRAM’s conflict of interest in deciding to approve VRAM’s redemption proposals.
Soon after receiving the letters, the Trustees established a special litigation committee (“Special Committee”) of six independent and disinterested trustees to investigate the allegations the letters had raised.[2] The Special Committee, aided by independent counsel, conducted a ten-month long inquiry: it reviewed thousands of pages of documents from the Trustees and VRAM, interviewed several Trustees as well as former and current VRAM personnel, obtained two expert reports analyzing the demands from Morgan Stanley, and met multiple times to discuss its progress and findings. At the investigation’s conclusion, the Special Committee issued a 162-page report in which it unanimously recommended to the full boards of the relevant Van Rampen Funds that they not pursue the claims in the demand letters because such litigation would not be in the best interest of the funds. The boards’ independent trustees unanimously adopted the Special Committee’s recommendation on June 23, 2011. Upon learning of the vote, the Nelsons and others decided not to challenge the Trustees’ decision.
On July 5, 2011, Averbuch, another VGM common shareholder, sent VGM a demand letter and filed the present derivative lawsuit on the same day.[3] Most of Averbuch’s allegations are the same as those that had been asserted by the Nelsons and the other Van Rampen Funds’ common shareholders in the earlier demand letters. Specifically, she alleged that the redemption decisions were taken to placate banks and brokers upon whom Van Rampen and the Trustees relied to sell additional funds and from whom VRAM generated management fees. Averbuch also claimed that the Trustees were under pressure from Morgan Stanley, which wanted to avoid the expense of acquiring the shares itself as required by its settlement that it had reached with the government. In sum, according to Averbuch, VRAM and the Trustees had put their own interests and the interest of ARPS holders over that of VGM’s common shareholders.
Given the similarity between Averbuch’s claims and those asserted by the Van Rampen Funds’ other common shareholders, the Trustees referred the letter to the Special Committee for review. The committee conducted an investigation and produced a 14-page supplemental report that recommended to the VGM board that a derivative suit would not be in the best interest *389 of VGM. This supplemental report incorporated the lengthier initial report by reference. This Court has reviewed both reports.
On August 30, 2011, the independent trustees of VGM’s board unanimously adopted the Special Committee’s recommendation that litigation was not in the best interest of the fund and voted to reject Averbuch’s pre-suit demand. Thereafter, they authorized the officers of Investco and VGM to request dismissal of the present lawsuit, leading to the motion now before the Court.
DISCUSSION
This Court applies Massachusetts law because VGM was a business trust organized under the law of Massachusetts during the relevant time period.[4] Derivative proceedings in Massachusetts are governed by the Massachusetts Business Corporations Act (MBCA), G.L.c. 156D. That statute allows a shareholder to commence a derivative action on behalf of the corporation after making a written demand on its board of directors to take suitable action. G.L.c. 156D, §7.42. The corporation then may move to dismiss the lawsuit if its directors determine that the maintenance of the action is not in the corporation’s best interest. It does so by way of a written filing with the Court setting forth facts to show that: 1) the determination was made by a majority of the board of directors who were independent: and 2) the independent directors made their' determination “in good faith and after conducting a reasonable inquiry . . .” G.L.c. 156D, §7.44(a) and (d). The Court “shall dismiss the suit unless the plaintiff has alleged with particularity facts rebutting the corporation’s filing in the plaintiffs own written submission.” G.L.c. 156D §7.44(d). This Court concludes that VGM has made the requisite showing and that Averbuch has failed to adequately rebut it.
First, it cannot be seriously disputed that the majority of VGM’s board was independent at the time Averbuch’s demand was rejected. Plaintiff concedes as much in her Complaint, which challenges only the reasonableness and good faith of the Special Committee’s investigation. In opposing this motion, plaintiff does note that each trustee on VGM’s board is a defendant in this action, but under the statute, that is not a valid reason to regard the trustee as anything less than independent. G.L.c. 156D, §7.44(c). “The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiffs demand can exercise their business judgment in the best interest of the corporation, free from significant contrary personal interest and apart from the domination and control of those who are alleged to have participated in the wrongdoing.” Hafhen v. Brown, 431 Mass. 838, 842 (2000). Averbuch has alleged no facts to suggest, under this standard, that the Trustees who adopted the Special Committee’s recommendation to seek dismissal of the case were anything less than disinterested.
Plaintiffs opposition instead focuses on the second requirement of Section 7.44, arguing that the decision to reject her demand and to seek dismissal of this action was not made in “good faith” after “reasonable inquiry.” As comment 2 to Section 7.44 makes clear, a decision by a majority of directors who are independent is a “business judgment to which the business judgment rule’s presumption of validity should apply.” Thus, while the corporation has the initial burden of coming forward with facts showing that the decision was “reasonable and principled,” ultimately, the plaintiff shareholder bears the burden of demonstrating that the decision was in bad faith and made with a lack of investigation. Harhen, 431 Mass, at 847-48. This Court concludes that Averbuch has not sustained her burden.
The VGM board rejected Averbuch’s demand after a fairly comprehensive inquiry by the Special Committee that, in two reports, directly addressed her various claims. The Special Committee interviewed numerous witnesses, reviewed thousands of pages of documents, obtained expert reports, and met several times to discuss its investigation and findings. It provided a detailed account of the circumstances surrounding the redemptions and thoroughly explained why it believed litigation was not in the fund’s best interest. More specifically, the two reports of the Special Committee provided plausible reasons for the decisions which are being challenged by this lawsuit. The Committee’s conclusions regarding those decisions include the following.
First, there was ample support for the decision to use TOBs to replace the leverage created by the ARPS. VGM was primarily invested in tax-exempt municipal bonds: consequently, because of the tax-exempt nature of the fund, its options for replacing the ARPS leverage were limited. Although TOBs were more expensive than ARPS at the time of the redemptions, historical data suggests that, in the medium and long term, TOB interest rates will remain at lower levels than those of the ARPS. In accepting VRAM’s recommendation to use TOBs, the Trustees reasonably believed that the cost of replacing the ARPS with TOBs would be less than the Maximum Rate that VGM and other funds were contractually required to pay the ARPS holders. In fact, (the reports noted) that belief proved to be correct over the coming months, and these savings benefitted common shareholders. Finally, the redemptions gave the funds comparable levels of leverage as had existed with the ARPS, so that the overall characteristics of the portfolios remained unchanged.
Second, the Trustees’ decision to redeem ARPS at face value was in line with industry practice, since few closed-end funds had redeemed the ARPS for below par. Indeed, it was difficult to assess the appropriate *390 market price for a below par redemption, given the absence of a fully formed secondary market for the ARPS.
Finally, the redemption decisions were not motivated by a desire to put either VRAM’s or Morgan Stanley’s interests above that of the common shareholders. VRAM had fully disclosed to the board the pressure it was under, and the Trustees understood that VRAM’s business concerns could not be a motivating factor in their decision. Indeed, the Trustees did not immediately agree to the initial round of redemp-tions proposed by VRAM, but waited until they had received more information on the risks of TOBs and conducted two additional board meetings before making a decision to redeem the ARPS.
As to Morgan Stanley in particular, the Special Committee’s reports pointed out that Morgan Stanley had never held more than 1.87% of VGM’s outstanding ARPS or more than 2.16% of the Van Kampen Funds’ total outstanding ARPS. Thus, its interest was minimal. Moreover, VRAM’s initial consideration of the redemptions preceded the government investigations that resulted in the settlement requiring Morgan Stanley to acquire ARPS from certain of its customers. Significantly, other fund complexes that did not have broker-dealer affiliates made similar decisions to redeem their ARPS, thus making it less credible that Morgan Stanley’s relationship to VRAM played a role in the Trustees’ redemption decisions.
Averbuch seeks to avoid the dismissal of her lawsuit by citing certain deficiencies that she says exist in the Special Committee’s findings. For example, she criticizes the committee for failing to interview certain people who would be critical of the redemption decisions. She also cites certain documents that were not discussed in the two Special Committee reports. The Special Committee’s failure to interview certain individuals or review the documents cited by plaintiff does not negate the fact that the Trustees did indeed consider the pressures and motivations that this evidence was meant to highlight, and took additional time to make their decision before acting on VRAM’s recommendation.
More broadly, Averbuch questions certain of the conclusions that the reports reach. Viewing the reports in their totality, however, this Court concludes that the reports bear none of the hallmarks of bad faith or suggest the “whitewash” that plaintiff claims. Notwithstanding Averbuch’s contentions, the Special Committee’s reports are comprehensive and thorough. In short, this Court sees no reason to question the business judgment of the independent Trustees who voted to adopt the committee recommendation that this case is not in the best interest of the VGM.
CONCLUSION AND ORDER
For all the foregoing reasons, the Nominal Defendant’s Motion to Dismiss is ALLOWED, and the Amended Complaint is hereby DISMISSED, with prejudice.

“Dutch” is not a reference to the geographical location of the auction but instead is a description of the way in which the auction is conducted.

In opposing this motion, plaintiff does not question the composition of the Special Committee. See Blake v. Friendly Ice Cream Corp., 21 Mass. L. Rptr. 131, 2006 Mass.Super. LEXIS 241 (denying corporation’s motion to dismiss because that Special Litigation Committee was not properly constituted).

As an alternative basis for its motion, the defendant argues that Averbuch therefore did not comply with G.L.c. 156D, §7.42(1)—an argument which would appear to have merit but which this Court need not address.

No party argues that, because VGM is a business trust instead of a corporation, the Court should not apply the MBCA.