Gants, Ralph D., J.
The defendant Manchester Sand, Cement & Gravel Co., Inc. (“Manchester Sand”), a wholly-owned subsidiary of the defendant Boston Sand & Gravel Co. (“Boston Sand”), is in the business of acquiring property to mine sand, gravel, and stone that Boston Sand turns into ready-mix cement. Manchester Sand owns roughly 3,000 acres of property in Hooksett, New Hampshire. Most of this land is located on the east side of Route 3, but roughly 250 acres is located about one-half to one mile to the west of Route 3 (“the West Side Property”). Among Manchester Sand’s mined-out property is a 42-acre parcel of land that is part of the West Side Property (“the 42-Acre Parcel”). On May 21, 1996, Boston Sand’s Board of Directors unanimously authorized Manchester Sand to lease the 42-Acre Parcel to defendant, Ankat Properties Inc. (“Ankat”), a corporation owned by two of Boston Sand’s officers and directors, defendant Dean M. Boylan, Jr. (“Dean, Jr.”) and his sister, defendant Jeanne-Marie Boylan (“Jeanne-Marie”), for $2,000 per month, with a three-year option to buy the Parcel for $255,000.
Daniel J. Boylan, Jr. (“Dan”), the uncle of Dean, Jr. and Jeanne-Marie, was a shareholder of Boston Sand and, indirectly, of Manchester Sand (since Boston Sand owns and controls Manchester Sand). Under the Separation Agreement he entered into with Boston Sand on June 15, 1995, Dean, Jr. and Jeanne-Marie were required to give Dan written notice of any proposed related party transaction, such as the proposed lease of the 42-Acre Parcel by Ankat, at least 30 days before Board approval of the transaction and to provide Dan with a copy of any appraisal of the property to be leased or purchased. There is no dispute that Dean, Jr. and Jeanne-Marie failed to provide Dan with this prior notice. After Dan learned of the proposed lease, his attorney wrote Dean, Jr. and stated Dan’s objections to it. He asked the Boston Sand Board again to review this transaction. He attached a letter he had written that day to Boston Sand attorney Lawrence Silverstein stating that he had retained a real estate consultant whose preliminary view was that the purchase price of $7,500 per usable acre was low. Dan’s attorney wrote that he and Dan had authorized a full appraisal of this property and would make a copy of the appraisal available to the Board once it was completed. He asked that no steps be taken to implement this agreement until the Board could consider the new appraisal. Despite this request, on June 30, 1996, Dean, Jr., on behalf of Manchester, and Jeanne-Marie, on behalf of Ankat, executed the Ground Lease (“the Lease") for the 42-Acre Parcel with the terms earlier agreed to by the Board.
On September 23, 1996, Dan’s attorney provided Boston Sand with a copy of the appraisal he had caused to be prepared by David Kirk (“the Kirk Appraisal”) , which opined that the fair market value of the 42-Acre Parcel as of July 1, 1996 was $600,000. This was well above the fair market value opined in the appraisal that had been furnished to the- Boston Sand Board prepared by Applied Economic Research, Inc. (“the AER Appraisal”), a licensed New Hampshire appraisal company, which had estimated that the fair market value of the 42-Acre Parcel as of July 26, 1995 was between $240,000 and $270,000, or roughly $7,000 to $8,000 for each of the roughly 34 usable acres.-[1] On November 4, 1996 Dan’s attorney wrote a letter to Dean, Jr. asking the Boston Sand Board to rescind the Ground Lease and prevent the sale of the 42-Acre Parcel in view of the Kirk Appraisal, which he attached, stating that the purchase price under the option in the Ground Lease was “grossly unfair, . . . especially when one considers that the $255,000 purchase price will be paid five years in the future, compared to an appraisal value of $600,000 in July 1996.” At the next regularly scheduled Board meeting on November 19, 1996, the Board discussed Dan’s objections to the Ground Lease but did not vote either to rescind the transaction or to ratify it.
This action was filed in 2002 by the plaintiffs, Dorothy L. Boylan (Dan’s wife) and Paul F. Ryan, as co-executors of Dan’s Estate (“the Estate”). Count I is brought as a shareholder derivative action on behalf of Boston Sand and Manchester Sand, alleging that Dean, Jr. and Jeanne-Marie breached their fiduciary duty by misappropriating a corporate opportunity— the Lease of the 42-Acre Parcel for less than its fair market value. The Estate seeks rescission of the Lease and the disgorgement of all profits earned from the Lease prior to the rescission. Count II alleges that Boston Sand breached the Separation Agreement by causing Manchester Sand to enter into the Lease without prior notice to Dan, as required under that Agreement.
On March 16, 2006, the Boston Sand directors unanimously voted to ratify the Board’s decision on May 21, 1996 approving the Lease of the 42-Acre Parcel to Ankat. All but one of the directors who voted at that meeting (John Mahoney) were the same who had originally voted to approve the transaction on May 21, 1996.[2]
On March 14, 2007, this Court denied Boston Sand’s motion for summary judgment as to the breach of fiduciary duly claim in Count I and the contract claim in Count II, and ordered that an evidentiary hearing be conducted to determine whether the ratification of the Lease in 2006 by the disinterested Boston Sand directors satisfied the three-tier test established in Houle v. Low, 407 Mass. 810 (1990). [22 Mass. L. Rptr. 290.] At that evidentiary hearing, this Court over six days heard the testimony of four witnesses — Bos *211 ton Sand directors John Mahoney, John Graham, and Dean, Jr., and Boston Sand attorney Lawrence Silverstein. Based on the testimony at the “Houle” hearing and the exhibits admitted into evidence, viewed in light of the governing law, this Court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
This Court described in detail the background of this dispute in its Memorandum of Decision and Order on Defendants’ Motion for Summary Judgment (“Summary Judgment D ecision”). Familiarity with that b ack-ground is assumed.
The Standard of Review
In this Court’s Summary Judgment Decision, this Court observed that Boston Sand, through the 2006 ratification by its three disinterested directors of the May 21, 1996 decision of the Board, essentially had voted to discontinue this shareholder derivative suit and sought the approval of the Court of that decision, which if granted would result in the dismissal of this action. In discussing the standard of review to be used, this Court wrote:
Essentially, the Supreme Judicial Court in Houle established a three-tiered test to evaluate these corporate decisions:
1. whether the directors who made the decision were “independent, unbiased, and [acted] in good faith,” and, if so,
2. whether the independent directors conducted “a thorough and careful analysis” and, if so,
3. whether the decision was “contrary to the great weight of the evidence.”
This is plainly a “heightened standard of review,” see Harhen v. Brown, [431 Mass. 838, 846 (2000)], far more demanding than the usual business judgment test, motivated by the Court’s concern for what it characterized as the “structural bias” of even disinterested directors to endorse the prior decisions of a Board comprised of a majority of interested directors and protect their fellow directors from the risk of liability.
Summary Judgment Decision at 25-26.
Boston Sand, in its closing argument and Post-Hearing Memorandum, contends that the three-tiered test in Houle is not the appropriate test, and that the Board’s ratification under the American Law Institute’s “Principles of Corporate Governance: Analysis and Recommendations” (“ALT Principles of Corporate Governance”) should be viewed as a “curative ratification” — a transaction that was authorized in advance by disinterested members of the Board but has been challenged for a technical defect or the failure to consider a material fact. Boston Sand argues that, since this was simply a curative ratification, Dan bears the burden of proving that “the terms of the transaction are so clearly outside the range of reasonableness that the directors . . . who authorized the transaction could not reasonably have concluded at the time of such authorization that the transaction was fair to the corporation.” ALI Principles of Corporate Governance, Comments to §5.02(a)(2)(B). Since the Court’s standard of review is so critical to the question of whether the Board’s ratification requires the dismissal of this action, this Court will discuss this legal issue before addressing the facts found from the evidentiary hearing.
Under Massachusetts law, if a director wishes to engage in a self-dealing transaction, he must make full and honest disclosure to the Board of all the known material facts of the proposed transaction, including the details of the transaction and his conflict of interest. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 532-33 (1997). See Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. 120, 128 (1997) (“full disclosure of all material facts respecting the finders fee agreement [is] a prerequisite for enforcement”). If the disinterested directors of the Board, after full and fair disclosure, give their assent to the proposed transaction, the approval by the disinterested directors is reviewed by the court under the business judgment rule. See Harhen v. Brown, 431 Mass. 838, 846 (2000). If the Board is self-interested and does not delegate the decision to the disinterested members of the Board or a Special Committee of disinterested directors, or if the Board fails affirmatively to approve or disapprove the transaction, then the self-interested directors of the Board bear the burden of proving that the decision was fair to the corporation. Demoulas at 533.
Here, this Court found on summary judgment that the initial approval of the proposed Lease by the Board on May 21, 1996 was null and void because Dean, Jr. and Jeanne-Marie failed to honor Boston Sand’s contractual obligation to give Dan 30 days advance written notice of the proposed transaction (as well as a copy of the AER Appraisal) and failed to inform the Board of the material fact that it had failed to provide the required notice. This Court also found that the Board failed either to rescind or ratify the transaction at its November 19, 1996 Board meeting. Therefore, when Dan prepared to file this shareholder derivative action in 2002, the lease transaction at issue had not lawfully been approved by the Board.
“In general, before filing a derivative action on behalf of a corporation, a plaintiff‘must establish that ... all available means to obtain relief through the corporation itself are exhausted by making demand on the corporation’s board of directors to prosecute the litigation.” Harhen v. Brown, 431 Mass. at 844, quoting Bartlett v. New York, N.H. & H.R.R., 221 Mass. 530, 532 (1915). “The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or majority of shareholders should set the corporation’s business *212 policy, including the decision whether to pursue a lawsuit.” Harhen at 844. “However, if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a ‘demand excused’ case.” Id.
If the majority of the Board is disinterested, so that demand must be made, and the Board decides not to proceed with the demand to pursue litigation against the self-interested director (a “demand refused” case), “a plaintiff may pursue the lawsuit only by showing that the demand was wrongfully refused.” Id. “In a demand refused case, because it is presumed that a disinterested board of directors acts ‘in good faith towards all [the corporation’s] members,’ and because directors ‘as a matter of business policy [ ] may refuse to bring a suit,’ a disinterested board of directors that has refused a plaintiffs pre-suit demand is entitled to the protection of the business judgment rule.” Id., quoting S. Solomont & Sons Trust v. New England Theatres Operating Corp., 326 Mass. 99, 113 (1950).
In a “demand excused” case, such as this, if the Board, after the filing of the shareholder derivative action, appoints a Special Litigation Committee comprised only of disinterested directors and delegates to this Committee the decision as to whether to terminate the litigation, the decision of the Special Litigation Committee does not enjoy the deference given under the business judgment rule. Harhen, 431 Mass. at 846-47; Houle, 407 Mass. at 826. “Rather, [the Supreme Judicial Court] applied a heightened standard of review to the special litigation committee’s decision to terminate the lawsuit, holding that, if an interested board appointed an independent and unbiased special litigation committee whose decision to terminate the litigation was ‘reasonable and principled,’ the decision of the special litigation committee would stand.” Harhen, 431 Mass. at 846-47, quoting Houle, 407 Mass. at 826.
The Boston Sand Board did not characterize its Board vote on March 16, 2006 as a vote by a Special Litigation Committee comprised of disinterested directors to determine whether to terminate this litigation; it characterized it simply as a vote to ratify the Board’s decision on May 21, 1996 approving the Lease of the 42-Acre Parcel to Ankat. If characterized as the former, there can be no question that the “heightened standard” of Houle would apply. Boston Sand contends that, simply by characterizing the vote as a ratification rather than a vote to terminate the shareholder derivative action, it can obtain a far more deferential standard, indeed, a standard more deferential than the business judgment rule.
Houle and Harhen would be rather feeble precedents if a self-dealing director could avoid the “heightened standard” of review and obtain a more deferential standard simply by characterizing the vote of disinterested directors as a ratification rather than a Special Litigation Committee determination as to whether to terminate a shareholder derivative suit. Unless Massachusetts law is to exalt form over substance, the only way to harmonize the holdings in Demoulas, Houle and Harhenis to conclude that, prior to the filing of a shareholder derivative suit, a vote by the disinterested directors, after full and fair disclosure, either to ratify the earlier transaction or to forego litigation challenging the earlier transaction is reviewed under the business judgment rule. But once the shareholder derivative suit has been filed, a vote by the disinterested directors, after full and fair disclosure, either to ratify the earlier transaction or to dismiss the litigation must be reviewed under the “heightened standard” of Houle.
The First Tier of the Three-Tier Houle Test: Independent, Unbiased Directors Acting in Good Faith
Having ascertained that the March 16, 2006 ratification must be reviewed under the “heightened standard” of Houle, this Court will now consider the first tier of the three-tier test that the ratification must survive to obtain judicial approval — that the directors who made the decision were independent, unbiased, and acted in good faith. There were three disinterested directors who voted at the March 16, 2006 meeting— John Mahoney, John Graham, and Dominic Dimaggio. Only the first two directors testified at the evidentiary hearing; Dimaggio did not testify, either in person or though deposition. Therefore, to have any chance of prevailing, Boston Sand must prove that both Mahoney and Graham were independent, unbiased, and acted in good faith.
In the Summary Judgment Decision, this Court found both Mahoney and Graham to be disinterested, noting that the Supreme Judicial Court has adopted the American Legal Institute’s Principles of Corporate Governance regarding the definition of an “interested” director, and that those Principles define a director as “interested” only if he has a familial, business, or financial relationship with the party engaged in the transaction or a financial interest in the transaction that would reasonably be expected to affect the director’s judgment with respect to the transaction, or if he is subject to the “controlling influence” of the party engaged in the transaction. Harhen v. Brown, 431 Mass. at 842; Demoulas, 424 Mass. at 523-24; ALI Principles of Corporate Governance, §§1.15 and 1.23. The Comment to Section 1.23 of the ALI Principles specifically declares, “It is not intended that a person would be treated as subject to a controlling influence, and therefore interested, solely because of a long-time friendship or other social relationship, or solely because of a long-time business association through service on the same board of directors or other relationship not involving direct pecuniary dealing.”
However, this Court in the Summary Judgment Decision also found that a “disinterested” director *213 need not be an “independent” and “unbiased” director under Houle, noting that the Supreme Judicial Court in Houle found that there was a genuine issue of material fact as to whether the disinterested director who comprised the one-person Special Litigation Committee was independent and unbiased, since her professional advancement depended on the directors who had engaged in the alleged usurpation of a corporate opportunity. See Houle, 407 Mass. at 823. Here, Mahoney’s and Graham’s professional advancement did not depend on Dean, Jr., Jeanne-Marie, or any of the interested members of the Board, but this Court finds, for other reasons, that they were not truly “independent” as that term was understood in Houle.
Mahoney
Mahoney, before joining the Boston Sand Board, had been a partner at Ernst & Young, Boston Sand’s outside auditor, since 1986, and had been assigned to handle Boston Sand’s account at or about that time. He left Ernst & Young in 1996, and joined Staples, Inc. later that year as its Chief Financial Officer. As of the date of the ratification vote in 2006, he served as Staples’ Chief Administrative Officer. Therefore, when he voted to ratify, he had no financial relationship to either Boston Sand, Ankat, Dean, Jr., or Jeannie-Marie apart from receiving the stipend paid to him as a director.
Mahoney, however, by his own characterization, was a “very close friend” of Dean, Jr. He met Dean, Jr. after college in the mid-1970s through the golf club they both belonged to, and began a social relationship that has endured through the present. He socialized with Dean, Jr. every other month, mostly through dinners at the golf club, but sometimes at their respective homes, and was a close enough friend that he routinely gave gifts to Dean, Jr.’s children. Mahoney played golf twice a week each summer, and would play with Dean, Jr. in about a fourth of those outings. No director with this close and this longstanding a personal relationship with the director whose self-dealing transaction was at issue can be said to be independent or unbiased in determining, effectively, whether the shareholder derivative action brought against that director should be dismissed. The Supreme Judicial Court in Houle recognized the “structural bias” that tends to push even truly independent directors to lean towards favoring their fellow directors. Houle, 407 Mass. at. 815. “[A] derivative action invokes aresponse of group loyalty, so that even a ‘maverick’ director may feel compelled to close ranks and protect his fellows from the attack of the ‘strike suiter.’ ... [A] refusal to protect one’s peers once events have transpired is seen as disloyal treachery.” Id. at 816, quoting Coffee & Schwartz, “The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform,” 81 Colum.L.Rev. 261, 283 (1981). That inherent structural bias, which even truly independent directors must resist when they serve on Special Litigation Committees, would rise to a fundamental obstacle to corporate due process if a director who would risk damaging a close, longstanding friendship by siding with the dissident shareholder would still be deemed “independent.” Such a friendship may not make him disinterested, but it does compromise his independence.
Graham
Graham’s independence is also compromised, but for a slightly different reason. Graham joined the Boston Sand Board after retiring as a divisional president of Lonestar Cement, the largest cement company in the United States. Graham has been a friend of Dean, Sr. since 1949, when the cement company for which he worked began supplying Boston Sand with cement. He and Dean, Sr. play golf together, have dinner together with their spouses, exchange gifts with each other, and celebrate major family events together. Now that both are retired and spend a great deal of time in Florida, they see each other often in Florida. He does not have the same social relationship with Dean, Jr., seeing him only at Board meetings. Graham, however, although retired now for nearly 20 years, still consults for Boston Sand, receiving $12,000 per year to keep Boston Sand informed of United States mineral and mining reports. When this Court considers in combination Graham’s nearly 60-year friendship with Dean, Sr. and the supplemental income he receives for what appears to be consulting work of modest value to Boston Sand, this Court cannot find him sufficiently independent to be entrusted with the decision of whether to dismiss a shareholder derivative action brought against his friend’s son.
The Second Tier of the Three-Tier Houle Test: a “Thorough and Careful Analysis”
While this Court’s finding regarding Mahoney’s and Graham’s lack of “independence” is sufficient alone for the ratification to fail the Houle test, this Court further finds that Boston Sand has also failed to meet its burden of proving the second tier of the three-tier test — that the independent directors conducted “a thorough and careful analysis.”
Mahoney
Mahoney was not a director of Boston Sand when the lease of the 42-Acre Parcel was initially approved by the Board on May 21, 1996, but he attended the Board meeting in his capacity as outside auditor and believed that the appraisal of the property prepared at that time by AER seemed a reasonable measure of fair market value. He had become a Boston Sand director by November 19, 1996, when the Board met to discuss Dan’s objections to the Lease and the alternative Kirk appraisal. Although Dan’s attorney plainly had asked the Board to rescind the Lease, Mahoney did not believe his function was to determine whether the AER appraisal or the Kirk appraisal provided the truer measure of the fair market value of the 42-Acre Parcel. *214 He testified that he had already determined that the transaction was fair based on AER’s appraisal and Silverstein’s legal advice. All he wanted to do at the November 19, 1996 Board meeting was resolve the dispute between Dan and Dean, Jr. He recalled that the Board told Dean, Jr. to resolve his differences with Dan. He recalled that Silverstein suggested that Dean, Jr. and Dan agree upon a third appraiser, whose estimate of fair market value would resolve the dispute. He recalled that Dan either opposed this solution or did not respond to the proposal.
Prior to the March 16, 2006 Board meeting, Mahoney learned by telephone from Dean, Jr. that the Board would be asked to ratify the May 21, 1996 lease. Dean explained that there was a question as to whether the Board’s vote in May 1996 was technically valid and they needed to correct this technicality by obtaining a formal ratification. Mahoney did not know what the technicality was that caused this problem, and did not ask; he recalled that the Board had indeed voted in May 1996 to approve the transaction.
Mahoney did not receive or review any written materials regarding the Lease until March 15, 2006 — the day before the meeting. At that time, he received a packet that contained the February 27, 1996 memorandum from Jeanne-Marie to the Board proposing the lease transaction, the agenda and minutes from the February 27, 1996, May 21, 1996, and November 19, 1996 Board meetings, the AER appraisal, the Kirk appraisal, the November 4, 1996 submission to the Board by Dan’s attorney challenging the Lease, and the Verified Complaint. Mahoney had reviewed each of these documents over the course of the years, whether as an auditor, Board member, or in preparation for his deposition, and he reviewed them again prior to the meeting, but there is no reason to believe that he read them again or even spent a substantial amount of time reviewing them given how little time he had to do so in the midst of a busy Staples work day and his understanding that the ratification was simply to correct a technicality.[3]
Mahoney testified that he did not know until the evidentiary hearing that the Separation Agreement gave Dan the right to advance notice of any related party transaction, or that Dean, Jr. and Jeanne-Marie had violated the terms of the Agreement by not giving Dan the required notice regarding the Lease of the 42-Acre Parcel. He testified that, if he had known about the failure to give advance disclosure of the transaction, he would have wanted to know why the disclosure had not occurred. Since this allegation was prominently made in the Complaint and since he claimed that he had reviewed “quite carefully” the documents furnished in advance of the March 16, 2006 meeting regarding ratification, his apparent ignorance of the terms of the Separation Agreement and of its violation suggests that he did not review those documents, at least the Complaint, as carefully as he claimed.
Silverstein led the discussion at the March 16, 2006 Board meeting regarding ratification, briefed the Board regarding the history of the transaction, and reviewed with them each of the documents in the packet. Mahoney did not recall that anyone at the meeting presented any of the arguments against ratification. Neither Dan nor his attorney were invited to the Board meeting to present their point of view. Mahoney was under the misimpression that Ankat had exercised its option to purchase the property some time after 2003 when, in fact, that option had not yet been exercised as a result of a tolling agreement entered into with Dan.
Mahoney apparently never focused on one glaring difference between the AER and Kirk Appraisals. The AER Appraisal observed that the only road access to the 42-Acre Parcel was via a rough gravel road that was blocked by boulders. It noted that, if someone wanted to build on the Parcel, they would have to bring the gravel road up to town specifications and install a traffic light at the intersection of this road with Route 3. The Kirk Appraisal noted that “[t]he recent construction of Legends Drive west from [Route 3] provides access to both the 42-acre parcel and a town-owned parcel which is being developed as a Safeiy Center housing the municipal police and fire departments.” In short, under the AER Appraisal, a prospective buyer would need to invest in building a new road to provide access; under the Kirk Appraisal, this investment would not be needed, since the road already existed. Mahoney testified that, by March 1996, the Board had been told of an agreement that had been reached between Manchester Sand and the Town of Hooksett in which, in return for the Town’s agreement to allow Manchester Sand to dispose of other large properties, Manchester Sand would donate several acres of land to the Town for a Safeiy Center and would agree to build a road from Route 3 to that Safety Center, which later became Legends Road. Consequently, Mahoney should have known that the Kirk Appraisal was more accurate in this regard than the AER Appraisal, and that any future buyer of this Parcel would have paved road access to it via Legends Road without having to invest a penny in building the road. Mahoney did not inquire into the cost of building the road, which was $300,000.
While there were other differences between the AER and Kirk Appraisals in which the AER Appraisal was more accurate, such as the acres of buildable land, this Court finds that, if Mahoney had performed a “thorough and careful analysis,” he would have recognized that a parcel whose fair market value the AER Appraisal estimated to be between $240,000 and $270,000 without paved road access may be worth considerably more if it came with paved road access paid for by Boston Sand.
In short, Mahoney viewed the issue of ratification as simply the correction of a technicality, reviewed the *215 key documents quickly in the day he had them, relied on the information provided by Silverstein (who this Court in the Summary Judgment Decision found to be an interested person), did not invite Dan’s attorney to be heard at the Board meeting or even hear Dan’s point of view presented, and, perhaps for that reason, did not consider that the AER and Kirk Appraisals differed as to whether the Parcel would have paved road access and who would pay to build that access road.
This Court recognizes that, in view of the relatively modest amount of money at issue in this transaction, a “thorough and careful analysis” may not necessarily have required Mahoney to retain a special attorney (as was retained in Houle) or to prepare a special report (as was completed in Houle), but it certainly required more thoroughness and more care than was employed in Mahoney’s analysis of this self dealing transaction.
Graham
Graham was on the Board in May 1996 and voted to approve the Lease to Ankat. He knew the terms of the Separation Agreement between Boston Sand, including the provision regarding related party transactions, because he recalled that the Agreement had been approved by the Board. When this related party transaction — the proposed Lease — was proposed to him without any objection from Dan, he assumed that Dan had been told of it in accordance with the Separation Agreement and simply chose not to object. However, when he learned of Dan’s subsequent objections to the Lease and discovered that Dan had not been given the required notice, he did not ask why the notice had not been given.
Prior to the November 1996 meeting, he reviewed the Kirk Appraisal and the letter from Dan’s attorney criticizing the Lease with Ankat. He also recalled reading a critique of the Kirk Appraisal by David Campbell, a real estate broker and attorney who specialized in local planning matters in New Hampshire and had worked extensively with Boston Sand and Dean, Jr., which caused him to believe that the AER Appraisal was a more accurate estimate of fair market value than the Kirk Appraisal. He also relied heavily on Silverstein’s advice, since he did not consider himself qualified to resolve the differences between the two appraisals. In November 1996, he did not think that rescission of the Lease was in the best interest of Boston Sand, in part because Dan never made any offer or presented any offers, and he preferred what he referred to as the “bird in hand.” He proposed bringing in a third appraiser if Dean, Jr. and Dan would agree that its estimate of fair market value would be binding, but Dan’s attorney rejected being so bound.
Graham, too, received the relevant documents concerning ratification only one day prior to the March 16, 2006 Board meeting and he, too, received a telephone call from Dean, Jr. prior to the meeting explaining that ratification was needed because there was some question as to whether the approval in 1996 was technically valid. Graham thought that the Lease transaction was effectively a “done deal,” that the option had been exercised and the sale had been consummated, and that there was simply some formality that had not been complied with which required the deal to be cleaned up. In response to the Court’s questioning, it became apparent that he had no clue as to why the Board was being asked to vote again in 2006 on a transaction that had been approved in May 1996. Perhaps that is why he did not even consider whether Dan’s attorney should have been given an opportunity to be heard.
This Court finds that Graham did not conduct anything approaching a “thorough and careful analysis” of the question of ratification. Like Mahoney, he viewed the issue of ratification as simply the correction of a technicality, and did not even understand the purported technical problem that required the Board to revisit the issue. He conducted, at best, a cursory review of the key documents quickly in the day he had them. He was under the misapprehension that the 42-Acre Parcel had already been sold. Indeed, there is no indication that he truly revisited the fairness of the Lease in March 2006 when he ratified the Board’s May 1996 approval.
Conclusion
Since Boston Sand needs to prove all three tiers of the three-tier Houle test in order to win judicial approval of the March 2006 ratification and has failed to meet that burden as to both the first and second tier, this Court need not consider whether it could satisfy the third tier. Having failed the Houle test, Boston Sand can obtain judicial approval of the Lease of the 42-Acre Parcel to Ankat only by demonstrating to the Court the fairness of the transaction. The expert testimony that this Court found to be irrelevant to the findings of the Houle hearing may be relevant to a hearing devoted to evaluate the substantive fairness of the transaction.
ORDER
After hearing, for the reasons detailed above, this Court finds that the ratification of the Lease in 2006 by the disinterested Boston Sand directors did not satisfy the three-tier test established in Houle. Therefore, counsel shall confer with each other and with the Court to set a date for a final evidentiary hearing to determine whether Boston Sand can meet its burden of proving the substantive fairness of the Lease.

The AER Appraisal noted that 6 to 7 acres of the 42-Acre Parcel were wetlands.

One of the directors, John Hallisey, had died in 1999.

At the time of the March 16, 2006 Board meeting, Mahoney was an Executive Vice President and Chief Administrative Officer at Staples, which meant he was the second-in-command of a corporation that, in 2006, had roughly 1,800 stores and revenues of roughly $19 billion.