Neel, Stephen E., J.
INTRODUCTION
This derivative action arises out of substantial investment losses to clients of nominal defendant State *38 Street Corporation (State Street) during the 2007 crash of the mortgage-backed securities market.
In a letter dated October 18, 2007 (Demand Letter), the plaintiff shareholders, Warren Pinchuck and Cora Bennett (Plaintiffs), demanded that State Street’s board of directors “take action to remedy harm” to State Street, including bringing litigation against State Street officers and directors (litigation demand). In May 2008, State Street’s board of directors (Board) informed the Plaintiffs that the Board had rejected their litigation demand. The Plaintiffs commenced this derivative action, alleging that various State Street officers and directors committed breaches of fiduciary duly (Counts I, II, III, and V), unjust enrichment (Count IV), and waste (Count VI).
State Street, and sixteen defendants comprising State Street’s Board,[4] have moved to dismiss this action pursuant to G.L.c. I56D, §7.44, which provides that “[a] derivative proceeding commenced after rejection of a demand shall be dismissed by the court on motion by the corporation if the court finds that” independent directors have “determined in good faith after conducting a reasonable inquiry upon which [their] conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation . . .” G.L.c. 156D, §7.44(a)(1). Section 7.44(d) provides that, if the corporation moves to dismiss the derivative suit, it shall “make a written filing with the court setting forth facts to show (1) whether a majority of the board of directors was independent at the time of the determination by the independent directors and (2) that the independent directors made the determination in good faith after conducting a reasonable inquiry upon which their conclusions are based.” In compliance with this provision, State Street has submitted the Declaration of David P. Gruber and the Declaration of Michael J. Chepiga.
“The court is to accept [the] information” the corporation has furnished, G.L.c. 156D, §7.44 comment 3, and “shall dismiss the suit unless the plaintiff has alleged with particularity facts rebutting the corporation’s filing in its complaint or an amended complaint or in a written filing with the court.” G.L.c. 156D, §7.44(d). The Plaintiffs rely on their verified complaint and the Declaration of Deborah R. Gross to rebut State Street’s filing.
For the following reasons, State Street’s motion to dismiss pursuant to G.L.c. 156D, §7.44, will be allowed.
BACKGROUND
The court takes the following facts from State Street’s and the Plaintiffs’ sworn written filings and from the verified complaint. G.L.c. 156D, §7.44(d).
State Street sold and managed various fixed income investments (“Bond Funds”) through State Street Global Advisors (“SSgA”), an unincorporated division of State Street’s wholly-owned subsidiary, State Street Bank & Trust Co. State Street marketed these Bond Funds as conservative investments that would yield stable, predictable returns. Plaintiffs allege that SSgA at some point changed its investment strategy as to these Bond Funds, causing them “to take risky asset-based securities positions tied to home equity loans, mortgage-backed securities swaps and derivatives . . .” Demand Letter, at 1. Plaintiffs allege that State Street made these changes without informing the investors, and that the collapse of the sub-prime market caused those Bond Fund investors to suffer considerable losses.
I. The Plaintiffs’ Demand
The Demand Letter details the litigation and potential legal action against State Street arising out of these losses. “[I]n light of the currently known liability exposures . . . (not to mention reputational harm, loss of business, and adverse effects on [State Street’s] costs of capital)) [sic], the harm to State Street exceeds $150 million, and may be far greater.” Demand Letter, at 2. The Plaintiffs asserted that
[t]his harm indicates serious mismanagement and wrongful conduct on the part of State Street executive management and operations management, and additional wrongful conduct and breach of fiduciary duty through failure to exercise oversight on the part of the non-management members of its Board ... In particular, [State Street] failed to maintain effective internal controls over investment management of its enhanced index bond funds and over communications and disclosures to its clients who invested in such funds, and failed maintain [sic] adequate systems of operational risk management in a high exposure fiduciary environment in which it held $1.9 trillion on behalf of its investment management clients. As a result, State Street (and, derivatively, its shareholders) have suffered financial harm for which it is entitled to recover damages from those responsible, and stands to face additional injuries absent remedial action addressing its internal control and operational risk management deficiencies.
Id. (emphasis in original).
The Plaintiffs demanded that State Street take the following remedial action:
1. Perform a thorough investigation of the matters referred to in this letter for the purpose of identifying the persons responsible and of identifying the root causes of the improper conduct and [State Street’s] failure to prevent it. . .
2. Take appropriate disciplinary action, up to and including suspension and/or recovery of incentive compensation, and termination for cause, of the persons responsible for perpetration of the wrongdoing and/or failure to detect and prevent it.
*39 3. Cause [State Street] to commence legal action for breach of fiduciary duty against the persons responsible for perpetration of the wrongdoing and/or failure to detect and prevent it (including, without limitation, Mr. [Ronald E.] Logue, Mark Flinn . . . , Michael Wands . . . , Sean Flannery the individual investment managers of. . . [certain Bond Funds] and all members of the Board), for the purpose of recovering monetary damages for the benefit of [State Street].
4. Undertake a comprehensive review and overhaul of [State Street’s] corporate governance and compliance practices and systems of internal control and operational risk management for the purpose not only of preventing recurrence of the failures detailed above, but to optimize them in light of current relevant best practices.
Demand Letter, at 3. The Plaintiffs concluded by informing State Street that, “[ajbsent such action, we intend to pursue legal redress on behalf’ of themselves and State Street. Demand Letter, at 4.
Through its chief legal officer, State Street responded to the Plaintiffs in a November 6, 2007, letter, informing them that State Street had referred the Demand Letter to a committee consisting of four members of the Board: Kennett F. Burns, David P. Gruber, Charles R. LaMantia, and Diana C. Walsh (Special Committee). State Street charged the Special Committee with investigating the matters in the Demand Letter and with making a recommendation for a response to the full Board. Verified Complaint, Ex. B.
The Plaintiffs also learned through a January 14, 2008, letter to their counsel, that the Board had retained Simpson Thacher & Bartlett LLP (Simpson) to assist the Board in connection with the Demand Letter. In a letter dated February 11, 2008, Simpson requested that the Plaintiffs provide it “with any and all factual information supporting the subject matters of the demand that is in your possession, custody or control, and not otherwise referenced in the Demand Letter . . . Once [Simpson has] . . . received any additional information . . . , the [Special Committee] will be better able to assess whether a meeting, as you suggest, is likely to be productive.” Verified Complaint, Exhibit C. Simpson also asked the Plaintiffs to inform it if there was any information they chose not to disclose.
Simpson attorney Michael J. Chepiga (Chepiga) informed Plaintiffs’ counsel via telephone, and John D. Donovan of Ropes & Gray LLP (“Ropes”) confirmed in a May 9, 2008, letter, that at a regularly-scheduled meeting of the Board on April 30, 2008, the Board “voted unanimously (Mr. Logue recusing) not to pursue litigation against any current or former director, officer or employee of State Street, or any other party, based upon the subject matter of the Demand Letter.” Verified Complaint, Exhibit D. The Board based its decision “upon the report and recommendation of the Special Committee of Independent Directors, appointed in November 2007, that was charged with investigating the matters described in the Demand Letter and making a recommendation to the full Board for a response to the Demand Letter.” Id.
II. The Officer Defendants
The Plaintiffs have asserted this action against eleven State Street officers (Officer Defendants). Three Officer Defendants—Peter G. Leahy, James Ross, and Mark E. Swanson—were senior executive officers with SSgA who served as trustees and/or officers of certain of the Bond Funds, and signed registration statements for the securities those Bond Funds issued.
The other eight named Officer Defendants are no longer with State Street. Officer Defendant Ronald E. Logue retired in March 2010; he was State Street’s chief executive officer. The remaining Officer Defendants left State Street as a result of the Bond Fund matter. Three Officer Defendants—Sean Flanneiy, chief investment officer, SSgA; Paul Greff, director of Global Fixed Income, SSgA; Michael O’Hara, head of active Global Fixed Income, SSgA— left State Street in November 2007. The remaining four Officer Defendants—Frank Gianatasio, head of Structured Debt, SSgA; William W. Hunt, president and chief executive officer, SSgA; Otello Sturino, chief operating officer, SSgA; Michael Wands, director, North American Fixed Income, SSgA—left State Street in January 2008
III. The Director Defendants
The following sixteen individuals were on the Board at the time State Street received the Demand Letter (“Director Defendants”). The Director Defendants were also members of various committees, as indicated:
Ronald E. Logue—Chairman of the Board; CEO of State Street
Tenley E. Albright—Examining and Audit Committee
Kennett F. Burnes—Examining and Audit Committee; Executive Committee
Peter Cojan—Nominating and Corporate Governance Committee
Nader F. Darehshori—Nominating and Corporate Governance Committee
Amelia C. Fawcett—Executive Committee;[5] Nominating and Corporate Governance Committee
Arthur L. Goldstein—Nominating and Corporate Governance Committee
David P. Gruber—Examining and Audit Committee; Executive Committee
Linda A. Hill—Executive Compensation Committee
*40 Charles R. LaMantia—Examining and Audit Committee; Executive Committee
Maureen Miskovic[6]—Examining and Audit Committee
Richard P. Sergei—Executive Compensation Committee
Ronald L. Skates—Examining and Audit Committee
Gregory L. Summe—Nominating and Corporate Governance Committee
Diana C. Walsh—Nominating and Corporate Governance Committee
Robert E. Weissman—Executive Compensation Committee
As noted above, the Special Committee consisted of four Director Defendants: Walsh, who was also on the Nominating and Corporate Governance Committee;[7] and Burnes, Gruber, and LaMantia, each of whom was also on both the Executive Committee and the Examining and Audit Committee.
IV. State Street’s Declarations A. Declaration of David P. Gruber
1.SSgA
In his declaration, Director Defendant Gruber states that SSgA is an unincorporated investment management division of State Street Bank and Trust Company, a wholly-owned subsidiary of State Street. SSgA’s tasks include managing collective investment trusts and separately managed accounts for institutional investors through varied investment management strategies, both active and passive. As of June 2007, the assets under SSgA’s management totaled approximately $1.5 trillion. Less than 1% of that amount, approximately $13 billion, “was held in managed fixed income funds, some of which had exposure to mortgage-related and mortgage-backed securities [i.e., the Bond Funds].” Gruber Declaration, ¶3. A steep decline in the housing market caused the Bond Funds to sustain significant losses in the summer of 2007, which, in turn, led to claims by several Bond Fund clients against SSgA in September 2007.
2.The Director Defendants
Of the sixteen individuals on the Board at the time State Street received the Demand Letter, State Street employed only one, Logue. Gruber characterizes the other fifteen Board members as “independent” by relying on the definition in State Street’s own Corporate Governance Guidelines (Guidelines). The Guidelines provide that a director is “independent” if (1) he or she “has no material commercial or charitable relationships with [State Street], including through family relationships or relationships (including family relationships) with organizations that do business with [State Street], or receive discretionary charitable contributions from [State Street;]" and (2) he or she is “independent” under section 303A.02(b) of the New York Stock Exchange Listed Company Manual. Gruber Declaration, ¶5 & nn. 1, 2.[8] The fifteen Director Defendants satisfy both requirements as neither State Street nor its subsidiaries employ them or their immediate family members, and they and their immediate family members have no involvement with or financial connection to the Bond Funds.
3.Ropes & Gray
Prior to the events relevant to this action, Ropes had performed legal work for State Street, but it had never been involved in matters related to SSgA’s fund management.[9] Thereafter, State Street retained Ropes “to investigate the facts underlying the [Bond Fund] losses, advise [State Street] and the Board concerning possible responses, and defend as appropriate the lawsuits that had been initiated.” Gruber Declaration, ¶8. By the time State Street received the Demand Letter, Ropes “had commenced a broad investigation into the circumstances surrounding the losses sustained by” the Bond Funds. Id.
4.The Special Committee, Simpson, and the Investigation
The Special Committee formed in response to the Demand Letter “was charged with investigating the matters referred to in the Demand Letter and recommending a course of action to the full Board.” Gruber Declaration, ¶6. Gruber was the Special Committee’s chair. At the Special Committee’s first meeting on November 14, 2007, Ropes attorneys were present “to explain the mechanics of responding to the Demand Letter.” Gruber Declaration, ¶7. During this meeting, the Special Committee discussed and established “the scope of the factual and legal investigation.” Id.; see Gruber Declaration, ¶9 (detailing discussion at first meeting). The Special Committee also decided at this meeting “that it would be appropriate and efficient to use the fruits of Ropes & Gray’s ongoing investigation as a part of its work in understanding factual issues underlying, and set forth in, the Demand Letter.” Gruber Declaration, ¶9; see Gruber Declaration, ¶8 (acknowledging that Ropes “was in the midst of an in-depth factual investigation for purposes of representing State Street in litigation brought by clients, and the scope of its factual investigation necessarily included the same facts that the Plaintiffs relied on in the Demand Letter”).
At its second meeting, on November 28, 2007,
the Special Committee decided to retain independent counsel to advise [it] on its response to the Demand Letter, including advising the committee on the appropriate scope of Ropes & Gray’s investigation, on how and whether to supplement that investigation, and on the legal issues that were likely to arise in connection with the committee’s *41 recommendation to the full Board on a response to the Demand Letter, including the possibilities of claims against officers or directors of [State Street].
Gruber Declaration, SI 10. The Special Committee reviewed Ropes’s recommendations for counsel as well as the Special Committee members’ recommendations, and ultimately decided to engage Simpson as special counsel. Simpson “had never previously represented State Street, or any individual officer or director ...” Id.
Simpson submitted questionnaires to all of the Board members, except for Logue, in order to determine their independence. The questionnaire included “questions regarding each Board Member’s ability to investigate and determine an appropriate response to the Demand Letter based on the best interests of State Street Corporation.” Gruber Declaration, Sill. The questions also sought information as to
(i) whether each Board Member had any type of relationship with current or former directors or managers of State Street Corporation or its subsidiaries, particularly State Street Bank and Trust Company or SSgA; (ii) whether each Board Member or his or her family members currently or previously had any involvement or business dealings with State Street Bank and Trust Company or SSgA; and (iii) whether any companies with which each Board Member was affiliated in any capacity had business relationships with State Street Corporation or its subsidiaries.
Id. The responses demonstrated that the Special Committee and the remaining Board members would be able “to exercise independent judgment with respect to the issues raised in the Demand Letter, [and] to make an independent determination concerning whether pursuing litigation was in [State Street’s] best interest.” Id.
Over the course of the six-month joint investigation, Ropes shared with Simpson “the details of its factual investigation, as well as relevant documents and electronic records . . . [and] also answered specific questions from Simpson ...” Gmber Declaration, S113. Ropes gave Simpson “access to key documents and other pertinent materials.” Gruber Declaration, SI 18. Simpson “independently evaluated this information for purposes of addressing the Demand [Letter].” Gruber Declaration, SI13. Simpson “also recommended specific areas for Ropes . . . to undertake additional factual inquiry, and Ropes . . . pursued and discussed with Simpson ... its findings from those inquires." Gruber Declaration, ¶18.
Ropes retained three expert consultants to assist in its review of SSgA. Charles River Associates’ role was to advise the Board with respect to the Demand Letter and to assist in connection with the pending litigation. To that end, it “focused on SSgA’s portfolio management and investment risk management functions . . . [and] undertook a comprehensive review of data and interviewed numerous SSgA employees as part of its review . . .” Gruber Declaration, ¶14. De-loitte & Touche’s role was to recommend improved practices to the Board and management. To that end, it conducted “a comprehensive review of internal controls, including those related to SSgA’s communications and agreements with clients, and portfolio management, trading, valuation, pricing, perfor-mancereporting, and compliance practices . . . [and] interviewed scores of SSgA employees and conducted an extensive review of SSgA documents . . .” Gruber Declaration, 115. The role of the third consulting group, Huron Consulting, was to assess and quantify the investment losses SSgA’s clients had sustained “both for purposes of responding to damages issues in pending and threatened litigation, and in order to assess potential damages to State Street relevant to the Demand.” Gruber Declaration, <3116.[10]
“In the aggregate,” Ropes or Simpson “reviewed more than nine million pages of documents.” Gruber Declaration, SI 17. Among those documents were “client contracts, communications, and reports, millions of pages of electronic communications, analytic investment and risk programs and files, and hard copy documents.” Id. Additionally, “ [consultants and attorneys reviewed and analyzed portfolio holdings, trading activity, and related investment losses, and evaluated quantitative methodologies and policies and procedures employed by SSgA to monitor risk and investment performance in the relevant funds.” Id. Attorneys and consultants also conducted interviews of more than fifty current and former SSgA employees, “focus[ing] primarily on events related to the management and un-derperformance of SSgA’s actively managed fixed income funds.” Id.
In Februaiy 2008, Simpson requested information from the Plaintiffs. On April 3, 2008, attorneys Chepiga, from Simpson, and Donovan, from Ropes, met with the Plaintiffs’ counsel. At this meeting, Chepiga and Donovan “explained the Special Committee’s extensive investigation. Plaintiffs’ counsel did not provide any additional information relevant to the investigation, but only provided a generalized offer to ‘help.’ ” Gruber Declaration, S120.
Throughout the investigation, the Special Committee met eight times, in person or by telephone, during which meetings Simpson, Ropes, or both presented the information they had generated. Gru-ber Declaration, SI 18. In late December 2007 and early January 2008, “it became clear to the Special Committee, which in turn reported its conclusions to the full Board . . . , that certain claims that had *42 been initiated or threatened by certain SSgA clients, or that could be initiated by certain clients, might have some merit.” Gruber Declaration, ¶21. The Board therefore decided that it was in State Street’s best interests
to establish a reserve for the purpose of dealing with, and where appropriate settling, such claims. Specifically, the Board determined to record a net charge in the amount of $467 million ($279 million after tax) in connection with the establishment of a $625 million reserve to address legal exposure and other costs associated with the underperformance of . . . [the Bond Funds], and customer concerns as to whether the execution of these strategies was consistent with the customers’ investment intent.

Id.

5. The Special Committee’s Determination
In April 2008, Ropes and Simpson “made an extensive joint presentation to the Special Committee concerning the findings of the investigation, legal theories that could be pursued against officers, directors, or others on those facts, the relative strengths and weaknesses associated with those theories, and the prospects for recovery.” Gruber Declaration, ¶22. The Special Committee discussed and deliberated on the matter extensively, considering “the merit of any such claims, the impact that pursuit of such claims would have on State Street’s business and other pending litigation, and the potential costs and benefits to” State Street. Id. The Special Committee ultimately “concluded that pursuing claims against officers or directors of State Street as requested in the Demand Letter, or against other entities that the Special Committee considered as possible targets of litigation, was not in the best interests of’ State Street, id., because, “(i]n view of the low likelihood of either success on the merits or collecting substantial damages,” pursuing litigation against certain State Street officers or directors would be “imprudent.” Gruber Declaration, 122(e).
Specifically, the Special Committee questioned the merits of potential claims that might be available to State Street and concluded that “even if claims could be asserted against any prospective defendant, the likelihood of prevailing on such claims was low.” Gruber Declaration, 122(c). The Special Committee based that belief on various conclusions it reached:
“[T]he portfolio management and other decisions that led to” the Bond Funds’ losses “were supported at the time by substantial analysis performed by members of the investment team following robust internal debate and employing appropriate risk analytics . . .” Gruber Declaration, 122(a).
With respect to five SSgA clients, “it appeared that SSgA may have violated investment guidelines or restrictions on the use of certain investment products in client accounts.” Gruber Declaration, 122(b). In “certain other instances, it appeared that there were potential inconsistencies between SSgA’s contractual obligations and authority and client understanding of the nature and scope of investments in actively managed fixed income funds.” Id. In both instances, however, it “appeared that these issues were isolated, and the product of likely miscommunication or inadvertence, and losses were limited in nature.” Id. It did not appear that these lapses “reflected a systematic absence of oversight or lack of controls that could be attributed to any individual officers or employees, or to a failure on the part of SSgA’s external accountants, auditors, counsel, or other advisers. Nor did it appear that client investment losses were caused by any such lapses.” Id.
The Special Committee also “considered the prospect for actually recovering meaningful judgments from any of those prospective defendants” and concluded that “the likelihood of actually collecting a judgment or settlement [was] exceedingly remote, and [was] outweighed by the current cost to [State Street] of pursuing such claims.” Gruber Declaration, 122(d). The Special Committee based this conclusion on the combined consequence of a number of considerations:
“[although some officers of State Street had substantial personal resources, they were in all cases substantially less than prospective losses incurred by clients or by State Street.” Gruber Declaration, 122(d).
“State Street was required under pre-existing contracts and its Articles of Organization and by-laws to indemnify officers and directors from most liabilities, and was in all circumstances obliged to advance to such individuals the costs of their defense against such claims.” [11]
“[T]he director and officer liability insurance policy issued to State Street contained express exclusions of coverage for claims initiated by [State Street] against any officer or director.” Id.
Finally, actively pursing litigation against certain officers and directors would also be imprudent because State Street was already “the subject of multiple lawsuits from clients, as well as the subject of investigation by multiple regulatory agencies that could pursue enforcement action against [State Street].” Gruber Declaration, 122(e). By commencing its own law suit, State Street would “risk[ ] abandoning what it viewed to be meritorious defenses to those proceedings, and providing a roadmap to its opponents in the process.” Id.
*43 6. The Board’s Determination
At a meeting on April 30, 2008, the Special Committee reported its findings and recommendations to the full Board, excepting Logue, who recused himself. Gruber Declaration, ¶23, and Exhibit C (PowerPoint presentation from April 30th meeting). During this meeting, the Board discussed with Ropes and Simpson “the scope of the investigation and its factual findings, including details of the roles played by multiple individuals at SSgA. Before it reached its ultimate decision, the Board excused Ropes . . . , and . . . consulted with Simpson . . .” Gruber Declaration, 123. The Board discussed the Special Committee’s findings and conclusions “at length” and “then voted unanimously against pursing any legal claims on State Street’s behalf, as requested in the Demand Letter.” Gruber Declaration, 124.
B. Declaration of Michael J. Chepiga
Chepiga is a Simpson attorney whom the Special Committee retained in December 2007 to provide it with “separate and independent legal advice regarding the factual investigation into the issues at [SSgA] . . . and to advise them on legal issues relating to the investigation and to advise them in connection with their consideration of the issues in the Demand Letter.” Chepiga Declaration, 15. Upon being retained, Chepiga submitted to each of the Board members, other than Logue, a questionnaire “to assess their independence with respect to the issues referenced in the Demand Letter.” Chepiga Declaration, 17. The information he obtained from the questionnaires confirmed “that the members of the Special Committee, and other [Board members] . . . , were fully able to exercise independent judgment with respect to the issues raised in the Demand Letter, and to make an independent determination concerning whether pursuing litigation was in [State Street’s] best interest.” Id.
During the course of his engagement, Chepiga met with the Special Committee “several times . . . both in person and by telephone. During these meetings I provided regular updates on the factual findings of the investigation . . . [and] discussed the legal consequences of those findings with the Special Committee.” Chepiga Declaration, 16. Ropes, which State Street had previously retained “to investigate pending litigation against [State Street] in connection with the same issues raised in the Demand Letter, attended some but not all of my meetings with the Special Committee.” Chepiga Declaration, 18.
Ropes had already spent time “investigating the facts underlying the Demand Letter as part of [its] work on pending litigation against State Street...” Id. Chepiga and the Special Committee “built on and evaluated [Ropes’s] factual investigation as part of our own inquiry.” Id. As a consequence, Chepiga was “in frequent contact with Ropes . . . regarding its factual investigation to discuss the document review, employee interviews, and the work of retained experts.” Id. Chepiga and other Simpson attorneys reviewed “many documents and other materials in connection with the inquiiy[,]” and Chepiga relayed to Ropes the Special Committee’s specific suggestions for follow-up in certain areas. Id. Ropes performed that follow-up work accordingly.
In a February 11, 2008 letter, Chepiga requested of the Plaintiffs, through their counsel, any additional information supporting their Demand Letter. Chepiga and Donovan, of Ropes, met with Plaintiffs’ counsel on April 3, 2008, at which time the latter “did not provide any additional information relevant to the investigation, but only provided a generalized offer to help.” Chepiga Declaration, ¶10. Also during this meeting they discussed “the Special Committee’s extensive investigation . . . [and] Plaintiffs’ counsel stated that it seemed that the investigation was very thorough and was not trying to hide anything.” Id.
On April 23, 2008, Chepiga and Ropes “made an extensive joint presentation to the Special Committee concerning the findings of the investigation, legal theories that could be pursued against officers, directors or others on those facts, the relative strengths and weaknesses associated with those theories, and the prospects for recovery.” Chepiga Declaration, ¶11. Ropes attorneys then left the meeting, and Chepiga “consulted with and answered questions from the Special Committee.” Id. The Special Committee engaged in “extensive discussion and deliberation” before concluding “that pursuing claims against officers or directors of State Street as requested in the Demand Letter, or against other entities that the Special Committee considered as possible targets of litigation, was not in the best interests of’ State Street. Id.
On April 30, 2008, the Special Committee reported its findings and recommendations to the full Board, excepting Logue, who recused himself. Ropes “attended the first portion of the meeting to discuss the scope of the investigation and its factual findings. The Board then excused Ropes . . . and [Chepiga] consulted with and answered questions” from the Board. Chepiga Declaration, ¶12. The Board then “reached [its] unanimous decision to not pursue the actions requested in the Demand Letter.” Id.
V. The Plaintiffs’ Declaration of Deborah R. Gross
Deborah R. Gross is the Plaintiffs’ counsel. In her declaration, she provides the court with several documents: State Street’s 2007 proxy statement and notice of annual meeting, containing biographical information on the Director Defendants; State Street’s 2009 proxy statement and notice of annual meeting; a Bloomberg.com article and a Pensions & *44 Investments article, both dated November 19, 2007, discussing the departures of Officer Defendants Flannery, Greff, and O’Hara; State Street’s Form 8-K, dated January 2, 2008, filed with the Securities and Exchange Commission, announcing Officer Defendant Hunt’s resignation from State Street; the Separation Agreement between Hunt and State Street, attached to State Street’s Form 10K filed with the SEC on February 15, 2008; a Reuters article, dated February 5, 2008, announcing the resignations of Officer Defendants Sturino, Wands, and Gianatasio; two State Street press releases discussing State Street’s leadership succession plan (October 22, 2009) and the increase in State Street’s legal reserve (November 6, 2009); State Street’s Form 8-K, filed with the SEC January 24, 2008, regarding State Street’s issuance of preferred stock, referencing opinion letters and consents from Ropes; excerpts from the Form 14A that State Street filed with the SEC in March 2006 showing that Truman Cas-ner, then a partner at Ropes, was chairman of State Street’s Executive Committee until his April 2006 retirement; and State Street’s Form 8-K, filed with the SEC on April 7, 2008, noting Director Defendant Miskovic’s resignation from the Board on that date, upon her appointment to the position of executive vice president and chief risk officer at State Street.
DISCUSSION
As noted above, a court “shall” dismiss a derivative action if independent directors have “determined in good faith after conducting a reasonable inquiry upon which [their] conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation . . G.L.c. 156D, §7.44(a).
I. Independence
Independent directors must make the determination as to maintenance of the derivative proceeding. G.L.c. 156D, §7.44(a), (b)(1). Other jurisdictions “ex-amin[ing] the qualifications of directors making the determination have required that they be both ‘disinterested’. . . and ‘independent’. . .” G.L.c. 156D, §7.44 comment l.A “disinterested” director is one who does not have “a personal interest in the transaction being challenged as opposed to a benefit which devolves upon the corporation or all shareholders generally," and an “independent” director is one who is not “influenced in favor of the defendants by reason of personal or other relationships.” Id., citing Aronson v. Lewis, 473 A.2d 805, 812-16 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).
The Massachusetts statute uses only the word “ ‘independent’ . . . because it is believed that this word necessarily also includes the requirement that the person [be disinterested, i.e.,] have no interest in the transaction.” Id. (emphasis added). Therefore, an independent director is one who does not have a personal interest in the challenged transaction and does not have a relationship, personal or otherwise, with the defendants that influences the director in the defendants’ favor. See id.; Blake v. Friendly Ice Cream Corp., 2006 WL 1579596, *13 (Hampden Super. Ct. May 24, 2006) (Agostini, J.) [21 Mass. L. Rptr. 131] (“Directors are considered independent if they are in a position to base their decision on the merits of the subjects before the board rather than being governed by extraneous considerations and influences”); see also Blake v. Friendly Ice Cream Corp., 2006 WL 2714976, *1 (Hampden Super. Ct. Aug. 24, 2006) (Agostini, J.) [21 Mass. L. Rptr. 610] (noting lack “of Massachusetts appellate case law elucidating the standard for independence under G.L.c. 156D, §7.44”).
In addition, a director will not be deemed not independent if “a defendant in the derivative proceeding or [a party] against whom action is demanded” nominated or elected him director; if the director has been named “as a defendant in the derivative proceeding or as a person against whom action is demanded”; or if the director approved “the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.” G.L.c. 156D, §7.44(c)(l)-(3); see G.L.c. 156D, §7.44 comment 1 (“It is believed that a court will be able to assess any actual bias in deciding whether the director is independent without any presumption arising out of the method of the director’s appointment, the mere naming of the director as a defendant or the director’s approval of an act where the director received no personal benefit from the transaction”); see also Blake, 2006 WL 1579596, *12 (noting that these three factors “do not support the conclusion that the Legislature intended to set a low threshold for the standard of independence”).
State Street’s declarations establish that the Director Defendants who voted on the Plaintiffs’ litigation demand[12] were independent. First, those Board members had no personal interest in the Bond Funds themselves. Simpson ascertained this fact through questionnaires which asked the Director Defendants whether they had any involvement or business dealings with SSgA or State Street Bank & Trust Co., of which SSgA was the investment management division. Exhibit 1 to Gross’s Declaration providing biographical information on each Director Defendant corroborates this conclusion.
Second, the Director Defendants also did not have a relationship, personal or otherwise, with any of the parties who are the focus of the Plaintiffs’ demand. The Director Defendants clearly had a professional relationship with Logue, a Board member. There is no dispute that Logue is not independent because, during the time relevant to this action, he was a State Street employee. Nor does the *45 fact that the Director Defendants are defendants in this derivative action negate their independence. G.L.c. 156D,§7.44(c)(2).
State Street has therefore demonstrated that the Director Defendants are independent within the statute’s meaning. G.L.c. 156D, §7.44(c); G.L.c. 156D, §7.44 comment 1. The Plaintiffs attempt to rebut this showing of independence on a number of bases, none of which they support with particularized facts.
First, the Plaintiffs argue that the Director Defendants were not independent because they face potential liability for breaches of their fiduciary duties. As noted, however, merely being named as a defendant in the derivative proceeding is insufficient to negate the directors’ independence. G.L.c. 156D, §7.44(c) (2).
Second, while Special Committee members were also on the Executive Committee, see supra n.7, the Plaintiffs have not provided any particularized facts demonstrating that membership on the Executive Committee rendered the Special Committee members biased. In their complaint, the Plaintiffs explain that State Street’s Executive Committee is “responsible for oversight of [State Street’s] assessment and management of risk.” Verified Complaint, ¶28^), quoting Executive Committee’s Charter. The Executive Committee reviews “Credit and Risk Management reports . . . [and] Key Risk Indicators and associated thresholds ...” Id. That committee also reviews “State Street’s Policy Statements and related guidelines addressing . . . Credit and Counterparty Risk; . . . Interbank Liability; . . . Real Estate Lending and Appraisal; . . . Operational Risk Policy; . . . Market Risk; . . . Treasury Policy; . . . and [o]ther policies with respect to risk assessment and risk management!.]” Id. The implication that follows from these duties, according to the Plaintiffs, is that members of the Executive Committee “were aware of . . . the need to carefully monitor Bond Fund portfolio managers, and . . . the facts concerning the market environment [i.e., the subprime mortgage crisis] . . .” Id. However, “[t]he mere fact that a director has . . . approved the action being challenged does not cause the director to be considered not independent!,]” G.L.c. 156D, §7.44 comment 1, and the Plaintiffs set forth no particularized facts beyond the fact of these Director Defendants’ membership in both committees. Contra Blake, 2006 WL 1579596, *15 (describing defendant director’s specific actions on board committees that contributed to finding that director’s involvement in the conduct at issue was “substantial and direct, rather than merely nominal or pro forma").
Third, the Plaintiffs argue that the Special Committee members had a close relationship with Logue. Again, the Plaintiffs provide no particularized facts demonstrating that the Special Committee members or any other Director Defendants were influenced in Logue’s favor. See Blake, 2006 WL 1579596, *13 (“A director’s independence may reasonably be doubted if there is ‘evidence' that in the past the relationship caused the director to act non-independently vis-a-vis an interested director.” (emphasis added) (citation omitted)).
Finally, the Plaintiffs contend the Director Defendants were not independent because they relied on the investigation which Ropes was conducting into the Bond Fund losses. The Director Defendants’ reliance on the fruits of Ropes’s investigation, alone, does not negate the Director Defendants’ independence. To support their argument that Ropes was not independent, and thus that the Director Defendants’ reliance on Ropes’s investigation rendered the Director Defendants not independent, the Plaintiffs rely on Ropes’s longstanding association with State Street, and the fact that Ropes was conducting the investigation into the Bond Funds on State Street’s behalf.
The Plaintiffs’ allegations do not rebut the facts in State Street’s declarations concerning the investigation. First, the Special Committee hired Simpson[13] to evaluate the materials from Ropes’s investigation; Simpson did evaluate the materials and recommended areas for Ropes to investigate further. Second, Simpson requested additional information from the Plaintiffs concerning their demand, but Plaintiffs did not provide anything further. Third, Simpson and Ropes met with Plaintiffs’ counsel on April 3, 2008, less than a month before the full Board voted on the Plaintiffs’ Demand Letter, and, after discussing the Special Committee’s investigation, the Plaintiffs’ counsel stated that it seemed that the investigation was “veiy thorough and was not trying to hide anything.” Finally, Ropes’s ongoing professional relationship with State Street, including the fact that one of its partners was on State Street’s Board prior to this investigation, without more, is not evidence that Ropes acted in any way other than in State Street’s best interest.
The Plaintiffs have accordingly not set forth particularized facts rebutting State Street’s demonstration that the Director Defendants other than Logue were independent.
II. Good Faith Determination after Conducting a Reasonable Inquiry A. Standard of Review
Independent directors must make the determination with respect to the plaintiffs demand, but they need not necessarily comprise the board’s majority; whether they do, however, establishes the standard the court must apply when evaluating the directors’ decision to reject the demand. “If a majority of the board of directors [does] consist! ] of independent directors at the time the determination is made . . . , *46 the plaintiff shall have the burden of proving that the requirements of subsection (a) have not been met [i.e., that the directors were not independent, and that they did not make their determination in good faith after a reasonable inquiry].” G.L.c. 156D, §7.44(e). In this instance, the decision to reject the demand “is, if made by directors, a business judgment to which the business judgment rule’s presumption of validity should apply . .. [T]o deprive the independent directors of the business judgment rule, the derivative plaintiff must plead and prove that the directors making the determination were not independent or did not act in good faith after reasonable inquiry.” G.L.c. 156D, §7.44 comment 2.
“If a majority of the board of directors does not consist of independent directors at the time the determination by independent directors is made, the corporation shall have the burden of proving that” the independent directors made the determination in good faith after a reasonable inquiry. G.L.c. 156D, §7.44(e) (emphases added). In this instance, “the business judgment rule’s evidentiary presumption of validity does not apply . . . [and the corporation must] prove that the determination was reasonable and principled[,]” a standard of review that appears in Houle v. Low, 407 Mass. 810 (1990). G.L.c. 156D, §7.44 comment 2.[14]
Here, the full Board consisted of fifteen members, i.e., the Director Defendants, at the time of the April 30th vote. There is no dispute that Logue, as a State Street employee, was not independent, and he appropriately recused himself. The remaining fourteen Director Defendants voted unanimously to reject the Plaintiffs’ litigation demand. As concluded above, the Director Defendants were independent, see G.L.c. 156D, §7.44 comment 1, and they certainly comprised a majority of the Board. The business judgment rule accordingly applies to the Board’s rejection of the Plaintiffs’ litigation demand. G.L.c. 156D, §7.44 comment 2. The burden therefore shifts to the Plaintiffs to “plead and prove that the directors making the determination . . . did not act in good faith after reasonable inquiry. ” Id.
B. Business Judgment Rule
In a “demand refused case” such as this,
because it is presumed that a disinterested board of directors acts “in good faith towards all [the corporation’s] members,” and because directors “as a matter of business policy [ ] may refuse to bring a suit,” a disinterested board of directors that has refused a plaintiffs pre-suit demand is entitled to the protection of the business judgment rule. The business judgment rule affords protection to the business decisions of directors, including the decision to institute litigation, because directors are presumed to act in the best interests of the corporation.
Harhen v. Brown, 431 Mass. 838, 845-46 (2000). A director taking or refraining to take action in the good faith exercise of the business judgment rule will not be liable for such actions. G.L.c. 156B, §65; G.L.c. 156D, §8.30. As a business judgment, the Board’s decision to reject the Plaintiffs’ litigation demand is entitled to the rule’s “presumption of validity.” G.L.c. 156D, §7.44 comment 2.
The Supreme Judicial Court decided Harhen prior to the effective date of G.L.c. 156D, §7.44 in July 2004, but the Plaintiffs’ burden is analogous to that which the Court set out in that case. See G.L.c. 156D, §7.44 comment 2 (application of business judgment rule where majority of board is independent “would include the situation presented in Harhen"). In Harhen, the Court held that “[i]n a demand refused case such as this, where the majority of the board is disinterested, the longstanding rule in Massachusetts is that the business judgment rule applies, absent a showing of bad faith or lack of investigation into the demand.” 431 Mass. at 847.
In the present case, the Plaintiffs have not met their burden of rebutting the application of this rule. Their main argument in support of their position concerns Ropes’s involvement.[15]^ As discussed above, however, the Plaintiffs have not demonstrated that Ropes was biased in State Street’s favor and to the shareholders’ detriment.
Harhen is instructive on the matter of the Director Defendants’ good faith decision based on a reasonable inquiry. There, the Court deemed reasonable and in good faith the board’s rejection, even though the board’s refusal letter was brief and two employees were unwilling to answer the plaintiffs attorneys’ questions as to the reasons for that refusal. Id. at 848. These facts did not “impugn the reasonableness of the board’s investigation,” especially given that, “at the time the demand was made, [the corporation] had already performed an internal investigation, reassigned or retired [the culpable parties], and instituted a moratorium on [the challenged activities].” Id. Here, attorneys from both Simpson and Ropes met with the Plaintiffs’ counsel prior to the Director Defendants’ rejection, and the Plaintiffs’ attorneys commented on the thoroughness of the investigation.
Further, the Director Defendants did comply with significant portions of three of the four demands set out on page three of the Demand Letter, i.e., that the Director Defendants (1) “perform a thorough investigation of the matters referred to in [the] letter for the purposes of identifying the persons responsible and of identifying the root causes of the improper conduct and [State Street’s] failure to prevent it”; (2) take “appropriate disciplinary action, up to and including suspension . . . and termination for cause, of the persons responsible for perpetration of the wrongdoing and/or failure to detect and prevent it”; and (3) *47 undertook, through counsel and retained consultants, “a comprehensive review” of SSgA.
The Plaintiffs accordingly have failed to rebut the presumption of validity which the business judgment rule affords to the Director Defendants’ decision to reject the litigation demand. See Blake, 2006 WL 1579596, *11 (“[I]f the plain tiff bears the burden under §7.44(e) yet fails to plead and prove that the [Board] members were not independent or did not act in good faith after a reasonable inquiry, the [corporation] is entitled to the business judgment rule and the action must be dismissed”).
Because the Court concludes that the majority of the Board comprised independent directors, the Court need not address the Plaintiffs’ arguments that the Board’s rejection does not meet the standard under Houle v. Low, 407 Mass. 810 (1990). See G.L.c. 156D, §7.44 comment 3 (where majority of the board is not independent, the burden of proof is on the corporation to show that the rejection was “reasonable and principled”).
D. Conclusion
The Plaintiffs have failed to meet their burden of rebutting with particularized facts State Street’s written filings. In the absence of such rebuttal, the Court must accept State Street’s written filings, which demonstrate that the Board acted in good faith and pursuant to a reasonable inquiry when it rejected the Plaintiffs’ litigation demand.
ORDER
For the foregoing reasons, State Street and the Director Defendants’ Motion to Dismiss pursuant to G.L.c. 156D, §7.44, is ALLOWED.

For simplicity, the Court will sometimes refer to the moving parties collectively as “State Street.”

Fawcett jointed the Executive Committee “sometime after March 17, 2008 . . .” Verified Complaint, 8112(f).

An attachment to the Declaration of Deborah R. Gross indicates that Miskovic resigned from the Board on April 7, 2008, upon her appointment to the position of executive vice president and chief risk officer of State Street.

In ¶28@) of their Verified Complaint, the Plaintiffs allege that all four members of the Special Committee, i.e., Bumes, Gmber, LaMantia, and Walsh, were also on the Executive Committee. In ¶12(0), however, the Plaintiffs do not include the Executive Committee in its description of Walsh.

Upon attempting to access the website Gmber offers for the Guidelines (http://www.statestreet.com/company/cor-porate_governance/guidelines.html#5), the court received a “Page Not Found” message. The court located the Guidelines at http://phx.corporate-ir.net/phoe-nix.zhtml?c=78261&p=irol-govGuidelines (last checked December 28, 2010).

“Until late October 2007, another Boston law firm served as the primary outside counsel for SSgA.” Gmber Declaration, ¶8.

Gmber’s Declaration suggests that, of the three consultants , Ropes shared with Simpson and the Special Committee only the information Charles River Associates collected. Compare Gmber Declaration, ¶14, with Gmber Declaration, ¶¶15 and 16. Given that Charles River Associates was charged with advising the Board solely with respect to the Demand Letter, this limitation does not appear to be improper. That notwithstanding, Gmber’s Declaration also states that “[t]he findings and underlying facts developed in the course of this investigation were shared with Simpson . . .” Gmber Declaration, ¶18.

According to the Articles of Organization attached to Gmber’s Declaration as Exhibit B, State Street must indemnify its officers, directors, and other agents from all liabilities unless the individual is finally adjudicated “not to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation ...” State Street must advance these individuals defense costs with the understanding that the individual must repay those costs to State Street “if it shall ultimately be determined that indemnification of such expenses is not authorized . . .” Because the Special Committee, after investigation, concluded that the Bond Fund losses resulted from miscommunication and inadvertence rather than any affirmative lack of good faith by any State Street officer, director, or agent, the Special Committee’s reliance on these provisions of the Articles of Organization was reasonable.

By April 30, 2008, when the Board voted on the Plaintiffs’ litigation demand, Miskovic was no longer on the Board; therefore, only fourteen Director Defendants voted. Miskovic was on the Board at the time the Board received the Plaintiffs’ Demand Letter and throughout the majority of the investigation.

The Plaintiffs argue that by describing Simpson as “independent counsel,” State Street admits that Ropes was not independent and, by extension, neither were the Director Defendants who relied on Ropes’s investigation. The Court does not view State Street’s use of this word as an admission of Ropes’s lack of independence. In any event, even if Ropes could be considered not “independent,” Simpson evaluated Ropes’s findings. The Plaintiffs have not provided any particularized facts demonstrating that Simpson, which had never before represented State Street or any of its officers or directors, was not independent.

In their opposition to State Street’s motion to dismiss, the Plaintiffs focus their analysis on the Houle standard, as they allege that a majority of the Board was not independent.

The Plaintiffs make an additional argument that also fails. Although the statute does not define “reasonable inquiry,” the Plaintiffs’ argument that the Board did not revisit the Plaintiffs’ litigation demand in 2009, after certain Director Defendants resigned, does not rebut the presumption of validity that attaches to the Board’s 2008 rejection of the Plaintiffs’ litigation demand. Prior to receiving the Demand Letter, State Street had commenced an investigation into the Bond Fund situation; upon receiving the Demand Letter, the Board commenced a simultaneous investigation into the matters that letter raised. Section 7.44 applies to “[a] derivative proceeding commenced after rejection of a demand . . .” G.L.c. 156D, §7.44(a). Where the statute focuses the court’s analysis on the rejection of the demand, a board’s lack of action with respect to that demand after the rejection is irrelevant.